OPINION OF THE COURT
Elaine Slobod, J.
The Town of Cornwall amended its local zoning law effective June 23, 2005. Among the changes made at that time to the Town’s code, the area on New York State Route 94 at the intersection of Jackson Avenue in the vicinity of the Bethlehem Church, an historic landmark, was up-zoned from one to two acres for single-family residences.
On April 12, 2004, some 14 months before this zoning change, the petitioner, Downey Farms Development Corp. filed an application with the respondent Planning Board to subdivide “Lands of Comito,” a parcel of approximately 62.59 acres[1] on Route 94 situated generally to the east of Jackson Avenue and the Bethlehem Church. The subject parcel is bisected by Route 94. In its initial submission to the respondent Board, the petitioner proposed the creation of 25 single-family lots. On its 37-acre parcel situated on the north side of Route 94, petitioner initially proposed the creation of 24 lots averaging approximately 1.5 acres in size, with one containing slightly less than one acre and two containing slightly more than two acres. The 25-acre parcel on the south side of Route 94 contained significant designated wetlands with their attendant 100-foot buffer zones. The latter acreage is a natural drainage area, as well as the proposed drainage area for the storm water runoff from the home sites petitioner seeks to develop on the northern parcel. Because of the wetland and buffer restrictions only one building site was proposed on the southern parcel.
At the time of petitioner’s April 12, 2004 application, the bulk requirements of Cornwall’s local code, as indicated, permitted single-family residences in this zone on one acre. In fact, in 2001 the petitioner’s principals had obtained final approval from the respondent Board for “Downey Farms Estates,” a single-family subdivision of 14 one-acre lots situated in this same zone. While petitioner’s instant application was wending its way through the Planning Board’s review process, the Town *568 Board of Cornwall began a review of the Town’s comprehensive plan. That review culminated in amendments to the plan including a recommendation for up-zoning the area in which petitioner’s proposed Comito subdivision was situated. As it would turn out, the Town Board, effective June 23, 2005, amended its zoning code in conformity with the revised comprehensive plan by up-zoning petitioner’s lands from one- to two-acre lots. That action effectively nullified petitioner’s 24-lot[2] subdivision application which, as indicated, had been proceeding before the Planning Board under the prior one-acre zoning. Notwithstanding appearances at multiple work sessions, Planning Board meetings, submission of numerous plan revisions, three visual impact studies, an archeological study and a traffic study over more than 14 months, that plan had barely received preliminary subdivision approval from the respondent when the zoning changed.
Respondent argues that it was just acting diligently and without bad faith. Petitioner ascribes the cause of the delay to abusive administrative procedures by the respondent. Therefore, petitioner commenced the instant CPLR article 78 proceeding in which it contended that because of respondent’s bad faith delays it had obtained vested rights to continue to proceed under the prior one-acre zoning. Petitioner argued that the evidence of the respondent’s and its advisors’ dilatory tactics established its entitlement to a “special facts exception” from the general rule that an application must be judged upon the law as it exists at the time of the Board’s decision (see Matter of Pokoik v Silsdorf, 40 NY2d 769, 772-773 [1976]).
Respondent’s motion to dismiss this proceeding pursuant to CPLR 7804 (f) was denied by decision/order dated January 3, 2006. On August 4, 2006, after full paper submissions, the undersigned concluded by decision/order that sufficient factual issues had been raised to suggest at least the possibility of “bad faith” (Matter of Hatcher v Planning Bd. of Vil. of Nelsonville, 111 AD2d 812, 813 [1985]) or possibly of a combination of both deliberate and some innocent administrative procrastination by respondent (see Matter of Our Lady of Good Counsel R.C. Church & School v Ball, 45 AD2d 66 [1974], affd on op below 38 NY2d 780 [1975]) to warrant a hearing.
*569 As a threshold issue, the petitioner was directed in the latter decision/order to be prepared to demonstrate by testimony from a disinterested third-party expert that, barring respondent’s bad faith, it was “possible under a best case scenario” for it to have obtained final approval and to have filed its map with the County Clerk prior to June 23, 2005, the effective date of the amended ordinance.
Extensive testimony was given on this issue before the undersigned on five different days between June 5, 2007 and July 23, 2007. Following receipt of trial transcripts, the parties submitted posttrial and reply briefs.
Threshold Issue
To satisfy the threshold question raised in the decision/order of August 4, 2006, the petitioner offered the testimony of Terry Rice, Esq., a recognized authority on subdivision law (Town Law art 16), particularly as that enactment relates to the complexities of zoning and subdivision procedures as they in turn are interwoven with the requirements of the State Environmental Quality Review Act (SEQRA) (ECL art 8).
The sum and substance of Mr. Rice’s testimony was to the effect that 12 to 13 months from initial submission would constitute a “generous” time frame within which final subdivision approval could have been obtained from the respondent Board and petitioner’s plat filed with the County Clerk. When pressed on cross-examination, respondent’s own engineer, Mark Edsall, acknowledged that “if’ the petitioner had been able to satisfy certain preconditions for final approval required by statute, rule or imposed by the respondent Board (i.e., SEQRA, County Health Department and Orange County Department of Planning [OCDP] General Municipal Law § 239-n reviews, Department of Transportation [DOT] approval, etc.), it could have filed its final plat before June 23, 2005, the effective date of the amended code.
To provide an engineer’s perspective of what could be a reasonable timeline for the progression of petitioner’s 24-to-25-lot application, the petitioner offered the testimony of Thomas B. Vanderbeek, a professional engineer with a degree in civil engineering and water resources. Mr. Vanderbeek is an engineering consultant with substantial experience in the area of drainage. He is a consultant for various municipalities in Rockland County. Mr. Vanderbeek has also acted as a project engineer for a number of single-family subdivisions, including several subdivisions in Orange County which recently had received *570 final approval, one in the Town of Goshen with 34 lots, and another in the Town of Woodbury containing 67 lots. He also alluded to a larger 450-unit project in this county situated in the Town of Woodbury.
In addition to creating timeline charts depicting best case scenarios for the theoretical progression of a 24-lot subdivision application from submission to final approval in 44 weeks, Mr. Vanderbeek testified that his 34-lot Goshen subdivision had obtained County Health Department approval within four to five months of referral and the 67-lot Woodbury subdivision in about six months.
Therefore, based on his experience, Mr. Vanderbeek opined that in practice it was possible for the Comito subdivision to have obtained final approval and plat filing by March 14, 2005. Additionally, Mr. Vanderbeek observed that in his experience he had never heard of a traffic study being required for a modest subdivision of 24 lots. Nor could he recall a visual impact study being required for a proposed drainage pond. Mr. Vanderbeek also indicated that certain items such as obtaining approval from the County Health Department and creation of a drainage district were routinely deferred by a Planning Board as contingencies which, among others, make up the “conditions” of a conditional preliminary subdivision approval. The implication being that in the Comito matter excessive time spent on these issues prior to preliminary approval was not warranted. Finally, he testified that DOT approval of off-site improvements to Route 94 would occur after the plat had been filed.
Based on the above testimony and related exhibits, there is credible evidence that other generally comparable subdivisions had been able to clear third-party reviews, including the rigorous review of water and septic designs by the Orange County Health Department, in as little as four to five months. It also appears that a public hearing could have been scheduled and preliminary subdivision approval granted with many items imposed as conditions to that approval rather than as preconditions to preliminary approval.[3] As was the case in the Downey Farms subdivision, the Board could have permitted petitioner to *571 pursue these conditions simultaneously between preliminary and final subdivision approval. Therefore, this court is satisfied that petitioner has demonstrated that in a “best case scenario” it was at least possible for it to have met the June 23, 2005 deadline if it had acted diligently. The evidence as a whole in this regard indicates that petitioner and its advisors responded in a timely manner to respondent’s requests.
However, satisfying the threshold issue of a “best case scenario” “possibility” does not end the matter, for the inquiry then turns to whether the reason petitioner’s application was so far from final approval on June 23, 2005 was due to deliberate delaying tactics and/or negligence of the respondent. If there is credible proof of such a nexus, a final inquiry arises, viz., whether the evidence supports the further conclusion that any “bad faith” and/or innocent delays were in the aggregate so substantial that they effectively deprived petitioner of a fair opportunity to obtain and file a final plat before June 23, 2005.
This court finds that the evidence supports petitioner’s position on both of these remaining issues.
Delay
While there were a fair number of factors which may have precluded an early vote on preliminary subdivision approval, the evidence does not support any valid reason for the respondent Board’s excessive delay in the initial step of scheduling a public hearing.
Since an EIS was not required in this matter, notwithstanding the make-work studies directed by the respondent Board, a negative declaration should have been filed and a public hearing held within 62 days of receipt of a complete preliminary plat (Town Law § 276 [5] [d] [i] [1]).
Subdivision (E) of section 125-5 of the General Code of the Town of Cornwall also provided that “[w]ithin 30 days of receipt of such documents in proper form, the Board shall fix a date for [a] public hearing on the proposed preliminary plat” (emphasis supplied).
“Proper form” constituted submission of copies of the “preliminary plat” and a “vicinity map” which petitioner had provided at the outset. {Id. § 125-3 [emphasis added].) Nevertheless, after receipt of these preliminary documents in April 2004, the respondent Board, without good cause, delayed scheduling the public hearing for 10 months by requiring near frivolous studies and then supplements thereof.
*572 From the beginning of its review of the Comito application, there is evidence that the respondent Board was disinclined to act in a timely manner. Avoidance of the mandate of General Municipal Law § 239-n (2) was perhaps the first indication of intentional or negligent delay. The OCDP is the agency authorized by the Orange County Legislature pursuant to the provisions of General Municipal Law § 239-Z (1) (a) to automatically receive, review and provide recommendations on local subdivision applications pursuant to the provisions of General Municipal Law § 239-n. The respondent Board was obligated to refer the petitioner’s preliminary request for consideration to the OCDP “upon receipt of application for preliminary and/or final approval” (General Municipal Law § 239-n [2] [emphasis supplied]). The respondent Board would not grant preliminary approval before receipt and consideration of the recommendations of OCDP Yet, referral was not made to OCDP until 10 months after petitioner’s application was filed and then only after the public hearing had commenced.
If a timely referral had been made, then OCDP’s recommendations (which after excessive delay in referral had been returned to the respondent Board in less than 30 days), even if only in preliminary form, could have been addressed by petitioner well before the first evening of the public hearing on February 7, 2005. As indicated, the respondent did not think to refer the matter to OCDP until three days after the February hearing.
The absence of OCDP’s report was cited as one of the reasons that the public hearing could not be closed on February 7. For some unexplained reason even after OCDP’s report had been received by respondent two days before the adjourned hearing date of March 7, the respondent was unaware of its receipt. This lack of communication among the respondent Board and its advisors provided a basis to keep the hearing open for yet another month.
Although other factors may also have been at play to keep the hearings open from February to April 2005, the lack of timely compliance with the mandate of General Municipal Law § 239-n (2) and then the failure to realize that a favorable recommendation from OCDP had been received constituted substantial reasons for delaying preliminary approval for approximately two to three months. Delay attributed to this factor was conceivably greater when one considers the fact that petitioner was placed in the position of responding to OCDP’s recommendations after the public hearing rather than prior thereto.
*573 Another force which kept the public hearing open was Board member Klosky’s opposition to a motion to close the hearing in February 2005 because, as he phrased it, “I’m always thinking of things fun for consultants to do.” (Emphasis supplied.)
The fun thing he asked for was a report on the “quality of the existing stone walls.” Read in isolation this request might not suggest that it could have been a pretext for delay. However, the minutes of the Board’s September 7, 2004 meeting, at which Comito was on the agenda, indicate that Mr. Klosky had also mentioned his concern for preserving stone walls at that time. Yet he did not assign this issue a priority in September so as to request that the Board’s consultants ascertain the quality of those walls. Nevertheless, five months later he suddenly changed his priorities and opposed closing the public hearing in order to give the Board’s consultants a “fun” thing to do. Since Mr. Klosky is himself a professor of engineering, it is doubtful that he required the Board’s Planning Consultant or Town Engineer to educate him as to the viability of the stone walls on Comito’s northern parcel.
The scheduling of the public hearing was in part also held up by the Board’s insistence that the Town Supervisor first decide whether or not the drainage basin proposed on petitioner’s southern parcel should take the form of a municipal drainage district. Allegedly, the Supervisor and the Town Attorney could not reach a consensus on this issue for the better part of a year thus adding another ingredient of delay to the progression of the Comito application.
Even the seemingly uncomplicated decision of the Town Highway Superintendent to issue a waiver for a two degree slope deviation for but a portion of the project’s interior roadway, another precondition imposed for preliminary approval, took almost 10 months. This delay prompted the Town Engineer to observe at one point that the petitioner had been “very patient” waiting for this waiver. As if to explain away his apparent tardiness, the Highway Superintendent’s subsequent cover letter to the Town Engineer seems to imply that issuance of that simple waiver had been delayed because his decision had required “numerous meetings” with the Engineer.
Due to an initial drafting error by petitioner’s engineers, a question arose prior to the scheduling of the public hearing whether the designated wetlands and buffers on the southern parcel also encumbered Comito’s northern parcel. Respondent’s consultants caused some minor delay by asking for clarification *574 of the issue even though they already had in their possession a very recent “NYSDEC Freshwater Wetland Boundary Validation” map dated December 29, 2004 which conclusively established the fact that the wetlands and buffer did not extend into the northern parcel.
Once the public hearing was opened, other delays were caused by meaningless consideration given by the respondent Board to such issues as the possible negative effect of petitioner’s decision to eliminate one of the original 25 lots by combining two contiguous lots. The respondent Board appeared inclined to respond to any suggestion which would cause delay to the Comito application including responding to a resident’s misguided contention that a video existed depicting flooding in the vicinity of the proposed detention pond when in reality the video when reviewed showed no such thing.
The courts normally are not permitted to second-guess the judgments of local planning boards or question their motives. Yet the fundamental premise for a “special fact exemption” is a finding of bad faith. Therefore, the motivation of the respondent Board becomes a paramount issue. In the context of the whole scenario of respondent’s processing of the Comito application, its decision to delay scheduling a public hearing until petitioner had retained experts to prepare first one, then another visual study depicting the potential effect upon the Bethlehem Church of the proposed detention pond appears highly suspect.
The half-acre pond in question apparently will be sited in a field at a point the length of two football fields from the church. The pond will be located on the opposite side of both the state highway and Jackson Avenue from the church. The pond site will be mostly obscured year round from the church by trees and will be hidden, at least in part, by a small two feet by four feet earthen berm on the project’s 25-acre parcel situated on the south side of the highway. Even the sight of the earthen berm will be shielded by the existing guardrail on Route 94. Respondent has not refuted petitioner’s commonsense argument that by simply placing a red flag(s) or traffic cone(s) at the site of the pond and inviting interested Board members to stand on the church’s steps, driveway, etc., would not only have permitted the Board members to have a clearer picture of the pond’s potential effects, but weeks, perhaps as much as two months could have been saved on petitioner’s timeline by eliminating these studies. The court notes that Mr. Klosky did not hesitate *575 to make a field trip to the historic church to observe the existing traffic flow on Route 94.
Absent evidence that the local code established a “viewshed” protecting other town residents’ views of the historic Salisbury Trestle, the court also finds more than suspect the Board’s decision to make petitioner produce a visual study of the potential obstruction by Comito’s proposed residential structures on others’ ability to view the Trestle. The court notes that the official county tax map for section 1 of the Town of Cornwall appears to place the residents whose views might allegedly be affected to be some 4,000 or more feet from the Trestle.[4] It is significant that even the Board’s Planning Consultant acknowledged that she had not seen the need for this Trestle study.
Petitioner’s principals believe that they are in a somewhat unique position to offer at least a general comparative example to support their argument that it was probable that they could have met the June 23, 2005 deadline absent the machinations they claim were involved in respondent’s processing of the subject subdivision. In May 2001 the Comitos had obtained final subdivision approval from the respondent Board for Downey Estates, a 14-lot subdivision situated on 27.2 acres also on Route 94 but on the opposite side of Jackson Avenue from the subject subdivision. Downey Estates is closer to the Bethlehem Church and contiguous to both the historic Salisbury Trestle and Downey House.
Petitioner points out that based on their submission of only a one-sheet sketch plan of their 14-lot Downey Estates subdivision, it was immediately accepted for review (Comito submitted detailed drawings of 16 pages). Within two months it had received the requisite Town Board approval to proceed as a cluster development (Comito is not a cluster design).
In less than six months Downey Farms was placed on the respondent’s agenda for a public hearing (Comito took 10 months). A negative declaration was voted upon on the first night of that public hearing. The hearing, at which no one from the public made comments (Comito drew strong public objection, including calls for delay until rezoning passed), was then closed, and preliminary subdivision approval granted that very night (Comito was kept open for two months). Downey Estates also fronted, and all its traffic accessed New York State Route 94 at a point approximately 1,000 feet generally west of Jackson *576 Avenue (Comito’s traffic entered Route 94 approximately 1,700 feet generally east of Jackson Avenue). However the respondent did not require a traffic study (Comito required such a study as well as an addendum). Also, although Downey Farms actually adjoined the Salisbury Trestle and visually impacted Downey House, the respondent did not require a visual impact study of either of these historic sites (Comito required three visual studies).
It is significant that Downey Farms’ preliminary approval[5] was conditioned on prospective approval of the New York State Department of Transportation, the Town’s anticipated approval of drainage specifications, anticipated future agreement as to maintenance of the drainage area and assumed future incorporation of unspecified erosion control measures to protect a nearby stream. Indeed, in order to avoid, as respondent’s draft negative declaration was phrased, “future delay to the applicant” the respondent Board in its 2000 negative declaration acknowledged that it was even granting conditional preliminary approval to the petitioner’s Downey Farms subdivision prior to receipt of the Office of Parks, Recreation and Historic Preservation determination of significance.
The subject Comito subdivision is larger than Downey Farms and must of necessity discharge storm water from its northern parcel into a detention pond on the south side of Route 94. Nevertheless, there are enough similarities between the two projects for the court to conclude, without the necessity of reading between the lines, that the subject Comito project was treated in a distinctly different manner because an amendment to the Town’s comprehension plan and the code’s bulk lot area requirements for this zone were in the offing.
Superimposed on the actions of the respondent Board are certain statements made by members of the Board which indicate that they were motivated to delay the subject application until the zoning code was amended.
Not only were members of the respondent Board of necessity aware of pending changes to the bulk requirements for this zone, but they were not reluctant to express opinions publically suggesting that the subject area should not be impacted by petitioner’s 24-lot subdivision.
The following minutes of the respondent Board’s November 1, 2004 meeting, which recorded a discussion by Board members *577 after petitioner and its attorney had left the meeting, strongly suggest that at least one Board member was motivated to delay petitioner’s application until the zoning was changed:
“discussion
“mr hazirjian: What can we recommend to the Town Board about this particular project [Comito] we just discussed? I mean, it was obvious and I didn’t have the, I don’t know how to say this nicely, they’re pushing for that last lot that they don’t have a well for, that’s exactly the kind of out of control development these guys are looking to scrape every dime out of this property, excuse me, and they’re coming to a public meeting, how about doing one less, 25, 26 isn’t enough, what can we say to the Town Board? What can we say to the Town Board? How about change the zoning quick? Isn’t there something we can say? Can’t we examine this and say help us?” (Emphasis supplied.)
Next, on December 14, 2004 respondent Board member Led Klosky appeared before the Cornwall Town Board to make a statement at a public hearing on proposed changes to the Town’s comprehensive plan. In a three-page written presentation he urged the Town Board to adopt lower density zoning along Route 94 near the Bethlehem Church “as soon as possible.” He stressed that “[t]ime is of the essence here, and if action isn’t taken quickly, that currently rural look on Route 94 that we all treasure will be gobbled up by subdivisions” (emphasis supplied).
Although Mr. Klosky indicated that he was expressing his personal views, he nevertheless added that he “would be surprised if a majority of [his fellow Planning Board members] disagreed with the ideas put forward” in his statement.
“Special facts exception” cases such as Matter of Pokoik inherently involve concepts of “vested rights” (Marsh v Town of Huntington, 39 AD2d 945 [1972]), thus each matter must be determined according to its own unique circumstances (Matter of Estate of Kadin v Bennett, 163 AD2d 308, 309 [1990]).
The Pokoik circumstances were uncomplicated. When a village building inspector refused to act on a permit application, a court directed him to do so. Thereafter it took almost three months for him to act, at which time he denied the permit. Between the date on which the petitioner subsequently filed an appeal with the zoning board of appeals and the date scheduled *578 for a hearing before that board, the village amended its zoning ordinance thereby removing a property right to which petitioner previously had been entitled. The Court of Appeals (40 NY2d at 772-773) characterized respondent’s actions as obvious dilatory tactics and decried such administrative procrastination calculated to deny rights to use land in a currently lawful manner.
In Figgie Intl. v Town of Huntington (203 AD2d 416 [1994]), the town planning director simply rejected a revised site plan for expansion of an existing building. The director’s initial explanation was that the property was going to be rezoned from light industry to residential. As forthrightly as that site plan was initially rejected, the Appellate Division found that the failure to act on the plan for that reason, and then for alleged technical deficiencies in the plans, was designed to prevent the petitioner from developing his property prior to rezoning and, therefore, vested rights to the prior zoning code had been acquired.
By contrast, the circumstances surrounding the progression of a subdivision application involve a myriad of possible interplays among the provisions of article 16 of the Town Law, General Municipal Law § 239-n, SEQRA, local codes, etc. Those factors, when added to the broad scope of a planning board’s discretion, make it difficult for a court to conclude that there was such unreasonable delay, innocent or otherwise, to support a “special facts exception” finding (see Matter of Our Lady of Good Counsel R. C. Church & School v Ball, 45 AD2d 66, 73 [1974]). However, in the Comito matter the court finds that there was evidence of enough dilatory actions by the respondent Board and its consultants throughout the process to support a “special facts exception” finding. Some actions which precipitated otherwise avoidable delays have not been explained; others, while appearing to be just part of a thorough and rigorous review process, upon closer scrutiny, appear to have been designed to delay without justifiable bases. Such a conclusion finds ample support in the words of some Board members.
There is no explanation for the Board’s failure to follow the mandate of General Municipal Law § 239-n (2). Had referral to OCDP been made even four months after receipt of petitioner’s April 2004 application, as suggested in Mr. Vanderbeek’s time-line, the County’s recommendation could have been received well before the public hearing in February 2005, thus avoiding that delay as well as the down time lost by petitioner when forced to respond to OCDP after the close of the public hearing. *579 Had respondent known that the recommendation was in hand before the March 2005 hearing, another month’s adjournment might have been avoided.
No serious attempt has been made to explain why the Town Supervisor could not make a decision for the better part of a year as to the legal form the drainage basin document should take. Nor is there an explanation why the Highway Superintendent took 10 months to provide a two degree slope deviation waiver for but a part of the interior roadway. There is an indication in the record that he was prepared to issue the waiver some five or six months earlier.
Also unexplained was the delay caused by the Board’s requirement for a full traffic impact study for this modest 23-lot northern parcel (see Matter of Morse v Town of Gardiner Planning Bd., 164 AD2d 336, 342 [1990]). Board member Klosky made an exaggerated characterization of Comito as: “a project of this magnitude going in at an intersection such as Jackson Avenue I regard as being [an] extremely dangerous interaction [sic]. I went out and observed it personally” (emphasis supplied).
The objective data collected in Comito’s detailed professional traffic study concluded that Route 94 in the vicinity of Comito’s single access road onto Route 94, which was not at the intersection but more than a quarter mile from the Jackson Avenue intersection, was not in fact a high accident location. The report’s predictable conclusion was that Comito would not have a significant impact on traffic. Even when the Board requested a supplemental report in order to factor in the possible affect on Route 94/Jackson Avenue from traffic associated with “The Reserve,” a 450-unit development in a neighboring town, still no objective evidence of adverse impact was revealed from what the supplemental report described as only a “fraction of [a] second delay” related to the site generated traffic effect of Comito.
The visual studies to determine the potential impact of the detention pond on the Bethlehem Church and the Trestle study are just as difficult to justify, particularly when the actual impact of the pond could have been more accurately gauged by a simple visit to church grounds by interested Board members. The study to analyze potential visual obstruction of the Salisbury Trestle was essentially meaningless since there was no recognizable legal right which could be enforced (see 1 NY Jur 2d, Adjoining Landowners §§ 61-64).
*580 The court finds that at least four to five months of unnecessary delays can be attributed to just the General Municipal Law § 239-n factors and visual and traffic studies. Certainly the other enumerated factors caused another one-to-two-month delay.
Absent the combination of all these delays, it was more than just possible for petitioner to have become one of that admittedly small group of subdivisions which perhaps could have cleared Health Department review and satisfied other conditions of preliminary approval within four to five months. Indeed, if petitioner had been made fully aware of the contents of the aforementioned comments made by certain members of the respondent Board, it is more than likely that petitioner also would have made “time of the essence” and therefore expedited its response to every request by the respondent.
Conclusion
This court finds that there is sufficient evidence, both direct and circumstantial, establishing a discernable pattern by the respondent Board and/or one or more of its advisors of either intentional or innocent, perhaps a combination of both, delay of the progression of petitioner’s application. The cumulative effect of their action and inaction created a substantial delay which denied petitioner a fair opportunity to at least attempt to obtain timely final subdivision approval and file its subdivision map before June 23, 2005.
Accordingly, the court grants the petition to the extent that it hereby declares that due to respondent’s improper delaying actions the petitioner had obtained vested rights prior to June 23, 2005 to proceed with the subject 24-lot subdivision under the provisions of the local code as it existed prior to June 23, 2005.

. The acreage is the aggregate of three separate tax parcels. Petitioner held title to one and was the contract vendee of the other two.

. Petitioner eliminated one of the original 24 lots on the northern parcel by merging two proposed adjoining lots into one larger lot by simply removing the lot line between them.

. Petitioner’s Planning Board attorney testified that petitioner was more or less pressured into agreeing to several questionable studies as preconditions for a public hearing and negative declaration after the Board’s planning consultant signaled that otherwise she was prepared to recommend a full environmental review with the consequent inherent extended delays of an environmental impact statement (EIS).

. Tax map distances are not necessarily 100% reliable.

. Preliminary approval is a precondition to obtaining the crucial review of the Orange County Department of Health.