

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Unlimited Storage Corporation<br><br>    Recurrida<br><br>            v.<br><br>Municipio Autónomo de Guaynabo Oficina de Permisos Urbanísticos<br><br>    Peticionarios | Certiorari<br><br>2011 TSPR 193<br><br>183 DPR ____ |

Número del Caso:   CC-2007-1035


Fecha: 15 de diciembre de 2011


Tribunal de Apelaciones:

                Región Judicial de Bayamón, Panel VII


Jueza Ponente:      Hon. Nélida Jiménez Velázquez


Abogada de la Parte Peticionaria:

                Lcda. Leonor Porrata Doria

Abogados de la Parte Recurrida:

                Lcdo. Daniel Martínez Oquendo
                Lcda. Laura R. Domínguez Llerandi

Abogado de la Junta de Planificación:

                Lcdo. Edgardo Veguilla González


Materia: Revisión Administrativa Procedente de la Oficina de Permisos Urbanísticos del Municipio Autónomo de Guaynabo


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Unlimited Storage Corporation
          Recurrida

          v.                                    *Certiorari*

                              CC-2007-1035

Municipio Autónomo de Guaynabo
Oficina      de       Permisos
Urbanísticos
          Peticionarios


Opinión del Tribunal emitida por la Jueza Asociada señora Fiol Matta

En San Juan, Puerto Rico, a 15 de diciembre de 2011.

El caso de autos nos presenta la ocasión para expresarnos acerca de la interacción entre la Junta de Planificación y los municipios autónomos en el proceso de recalificación indirecta del suelo municipal. Examinaremos también la aplicación de un Plan de Ordenación Territorial y el proceso para su revisión.

I.

El 23 de mayo de 2003, Unlimited Storage, Corp. (Unlimited) presentó, por conducto del ingeniero Camilo Almeyda Eurite, una solicitud de enmienda a la consulta de ubicación Núm. 2001-16-0173-JPU, sobre un proyecto comercial ubicado en una finca con cabida de 4.27 cuerdas en el Barrio Frailes del Municipio Autónomo de

Guaynabo (Municipio).[1] Luego de que Unlimited entregara la documentación pertinente y se publicara la notificación por edicto de vistas públicas, la Junta de Planificación (Junta) celebró una vista. A ésta no acudieron vecinos ni comparecieron las agencias públicas. Sin embargo, el Municipio asistió, representado por el señor Luis Martínez, a través de la Oficina de Permisos Urbanísticos del Gobierno Municipal.[2]

La enmienda a la consulta de ubicación solicitada propuso eliminar la estructura originalmente autorizada para oficinas y sustituirla por tres edificios dedicados a un negocio de mini-almacenes. Como resultado de estas modificaciones, el área total de ocupación disminuiría de 250,000 pies cuadrados a 100,766 pies cuadrados, lo cual conllevaría una reducción considerable en el impacto del proyecto a su entorno inmediato. Además, Unlimited le solicitó a la Junta la recalificación del predio, hasta entonces compuesto por un Distrito Residencial Tres (R-3) y

_____

[1] Dicha consulta fue aprobada el 24 de julio de 2002. La Junta de Planificación autorizó el proyecto original como "un proyecto comercial para la construcción de un edificio de cinco (5) plantas con un área total de 200,000 pies cuadrados que albergaría oficinas, de las cuales 1/3 parte será de alto volumen de clientela y los restantes 2/3 partes serán para oficinas comunes. Se proveerá, además, 900 espacios de estacionamientos en cinco niveles, para un total de 250,000 pies cuadrados". Resolución de la Junta de Planificación de 6 de octubre de 2004, pág. 1.

[2] Íd.

un Distrito Comercial Tres (C-3),[3] a un Distrito Industrial Liviano (I-1).[4]  Esta petición, según la parte proponente, se debió a la necesidad de que los parámetros de diseño del proyecto fueran conformes al de dicho distrito industrial. Unlimited argumentó que el proyecto de mini-almacenes operaría como un negocio comercial de alquiler al detal de espacio y que, por tanto, sería de extrema conveniencia

---

[3] "El proponente solicitó a la Junta [de Planificación] la recalificación del predio de un Distrito Residencial Tres (R-3) y Comercial Central Tres (C-3), según contempla el Mapa de Calificación de Suelos del Plan Territorial del Municipio Autónomo de Guaynabo, a un Distrito Industrial Liviano (I-1). Por consiguiente, la Junta [de Planificación] tiene ante su consideración una solicitud de cambio de calificación de un Distrito R-3 y C-3 a un Distrito I-1". *Íd.*, pág. 2. El Distrito R-3 es definido como "[aquel] distrito de densidad poblacional intermedia [que] se establece para clasificar **áreas residenciales desarrolladas o que puedan desarrollarse y en donde se permitirán diferentes tipos de viviendas** en solares de trescientos (300) metros cuadrados o más". (Énfasis nuestro). Sección 9.01 del Reglamento de Calificación de los Suelos del Municipio Autónomo de Guaynabo (Reglamento de Ordenación Núm. 3), Vol. III, pág. 59. Mientras, la Sección 16.01 del Reglamento de Calificación de los Suelos, supra, define el Distrito C-3 como "[aquel] distrito [que] se establece para clasificar **áreas comerciales existentes de carácter central**". (Énfasis nuestro). *Íd.*, a la pág. 92.

[4] El Distrito I-1, o industrial liviano, se define como "[aquel] distrito [que] se establece para clasificar áreas para el establecimiento de industrias livianas. Se persigue que los terrenos para industrias livianas se dediquen a tales fines, **excluyendo en estos distritos el uso residencial y ciertos usos comerciales**". (Énfasis nuestro). *Íd.*, a la pág. 109.

para la comunidad residencial y comercial del área, la cual demuestra un uso y comportamiento mixto.[5]

Durante el procedimiento de evaluación, las diversas agencias públicas consultadas avalaron la enmienda a la consulta de ubicación del proyecto sometido por Unlimited. A su vez, el Municipio endosó el proyecto de mini-almacenes e informó, por conducto del Vice-Alcalde, licenciado Efraín Pérez Jiménez, que el desarrollo propuesto por Unlimited era compatible con la política pública municipal para el suelo urbano, según establecida en su Plan de Ordenación Territorial.[6]

Mediante Resolución emitida el 6 de octubre de 2004, notificada el 5 de noviembre de 2004, la Junta autorizó la enmienda a la consulta de ubicación y ordenó que el proyecto propuesto tuviese parámetros de diseño conforme a

---

[5] "El proyecto contempla un uso industrial liviano de almacén no tradicional, en la medida en que ofrece el alquiler de espacios para almacenaje temporero [sic] requiere de poca mano de obra. **Por ello entendemos armoniza con el comportamiento mixto del sector. Máxime cuando aparenta no tener efectos negativos sobre el ambiente y la [Junta de Calidad Ambiental] ha certificado el cumplimiento con el Artículo 4(c) de la Ley sobre Política Pública Ambiental**". [citas omitidas]. (Énfasis nuestro). *Íd.*, pág. 7. Esto, a su vez, coincide con las expresiones del tratadista Yokley, quien señala que el uso contemplado para el proyecto de Unlimited Storage, Inc., de mini-almacenes, puede ser considerado un uso comercial. ("Commercial uses range from retail stores, **to self-storage facilities**, to restaurants".) (Énfasis nuestro). E.C. Yokley, Zoning Law and Practice, 4th Ed., LexisNexis, Matthew Bender, 2009, pág. 38-1.

[6] Misiva de la Oficina del Alcalde del Municipio Autónomo de Guaynabo de 12 de noviembre de 2003.

un Distrito I-1. Entre sus múltiples consideraciones, la agencia consideró el Reglamento de Calificación del Municipio, así como el comportamiento y la actividad del área circundante al proyecto, la naturaleza del negocio propuesto y el cumplimiento con los criterios para desarrollos extensos, entre otros.[7] La Junta reconoció la viabilidad del proyecto, junto a las expresiones del Ejecutivo municipal en cuanto a la conformidad del proyecto con el Plan de Ordenación del Municipio. Resulta importante destacar que ninguna de las personas interesadas que fueron notificadas de la vista pública y de la Resolución de la Junta, incluyendo el Municipio, solicitó reconsideración ni acudió en recurso de revisión ante los foros judiciales, por lo cual la resolución de la Junta advino final y firme.

De conformidad con lo dispuesto por la Junta, el 19 de octubre de 2005, dentro del término dispuesto para ello, Unlimited solicitó a la Oficina de Permisos Urbanísticos del Gobierno Municipal Autónomo de Guaynabo la autorización de anteproyecto para la construcción del negocio de mini-

---

[7] En esta instancia la Junta de Planificación evaluó, conforme a lo dispuesto en la Sección 94.00 del Reglamento de Calificación de Suelos, la conformidad del uso propuesto a la luz del Plan de Ordenación Territorial del Municipio, la disponibilidad de la infraestructura en el sector, la forma en la cual propicia el desarrollo integral del sector y la viabilidad de dicho proyecto. Por otro lado, consideró detenidamente las implicaciones de un desarrollo extenso de diseño industrial liviano, según dispone la Sección 96.05 del Reglamento de Calificación de Suelos, supra, cumpliendo con todos los requisitos.

almacenes. Posteriormente, considerando que este procedimiento se había extendido más de lo usual, Unlimited sostuvo una serie de reuniones con el Alcalde y su grupo de trabajo, además de cursar varias misivas con el fin de agilizar los trámites.[8] A pesar de ello, y en vista de que la Oficina de Permisos aún no había actuado sobre su solicitud, Unlimited presentó, el 30 de marzo de 2007, un recurso extraordinario de *mandamus*, solicitando al Tribunal de Primera Instancia que le ordenara al ente municipal atender y resolver la autorización de anteproyecto presentada. Mediante Resolución y Orden dictada el 11 de abril de 2007, notificada el 18 de abril de 2007, el Tribunal de Primera Instancia le concedió al Municipio un término de 20 días para notificar si procedía o no la solicitud de la parte proponente.[9]

Finalmente, el 1 de mayo de 2007, el Municipio denegó la solicitud de autorización de anteproyecto. El Municipio concluyó que el desarrollo del proyecto de mini-almacenes con parámetros de diseño industrial no era viable, entre otras razones, por el uso residencial y comercial existente en el área. Según se desprende de la resolución, la decisión del ente local se debió, principalmente, a los

---

[8] Véase, misivas dirigidas al Alcalde del Municipio Autónomo de Guaynabo de 7 y 15 de septiembre de 2006. Anejo 6, Apéndice 4, pág. 81.

[9] Resolución y Orden del Tribunal de Primera Instancia, Apéndice 4, pág. 236.

cambios en la política pública, producto de la revisión en curso de su Plan de Ordenación Territorial, que una vez concluidos convertirían el área donde se había de ubicar el proyecto en uno estrictamente residencial. Inconforme, Unlimited recurrió ante el Tribunal de Apelaciones mediante recurso de revisión y arguyó que las actuaciones del Municipio constituían un ataque colateral tardío e indebido a la consulta de ubicación aprobada por la Junta.

El 10 de septiembre de 2007, el foro apelativo revocó la decisión del Municipio. Este dictamen se fundamentó en que las facultades conferidas por el Convenio de Transferencia de Competencias le habían concedido al Municipio el poder de determinar si el anteproyecto cumplía con las leyes y reglamentos aplicables, pero no la potestad de denegar el anteproyecto porque el desarrollo tal como fue aprobado por la Junta contemplaba un cambio de calificación del solar.

Inconforme, el Municipio solicitó reconsideración y argumentó que el proceso de recalificación no podía llevarse a cabo ante la agencia central, ya que el mismo se rige por el Artículo 13.008 de la Ley de Municipios Autónomos.[10] El foro apelativo denegó la solicitud de reconsideración, luego de lo cual el Municipio recurrió

---

[10] 21 L.P.R.A. sec. 4606.

ante este Tribunal mediante petición de *certiorari* señalando los siguientes errores:

1. Erró el Tribunal de Apelaciones al determinar que la recalificación del suelo dentro de la demarcación geográfica del Municipio fue atendida por la Junta de Planificación cuando autorizó la consulta de ubicación y, por lo tanto, es un asunto final sobre el cual el Municipio no tiene jurisdicción.

2. Erró el Tribunal de Apelaciones al permitir que el proceso cuasi-adjudicativo de la consulta de ubicación esté por encima de los postulados del Artículo 13.008 de la Ley de Municipios Autónomos en cuanto al proceso de recalificación.

3. Erró el Tribunal de Apelaciones al provocar la legalidad de una recalificación indirecta del suelo municipal por parte de la Junta de Planificación cuando la Ley de Municipios Autónomos nada dispone al respecto.

4. Erró el Tribunal de Apelaciones al obviar que la Ley de Municipios Autónomos nada dispone sobre la facultad retenida por la Junta de Planificación para recalificar el suelo municipal.

5. Erró el Tribunal de Apelaciones al no reconocerle al Municipio la facultad de aplicar los Objetivos y Políticas Públicas de su Plan de Ordenación Territorial, en violación a la Ley de Municipios Autónomos y la jurisprudencia aplicable.

6. Erró el Tribunal de Apelaciones al reconocer derechos adquiridos a una entidad privada, Unlimited, sobre el derecho del Municipio de ordenar, reordenar y revisar su Plan de Ordenación Territorial.

El 7 de marzo de 2008 expedimos el caso de autos. Luego de presentados los alegatos de las partes, la Junta solicitó un término para expresarse sobre los señalamientos de error del Municipio, a lo cual accedimos mediante Resolución de 25 de junio de 2008. Contando con la

comparecencia de la Junta, y los alegatos de las partes, procedemos a resolver.

## II.

La Ley Núm. 75 de 24 de junio de 1975, mejor conocida como Ley Orgánica de la Junta de Planificación de Puerto Rico, encargó a la Junta la misión de servir como el organismo estatal encargado de guiar el desarrollo integral de Puerto Rico, tomando en consideración las actuales y futuras necesidades sociales y nuestros recursos humanos, ambientales, físicos y económicos.[11] Dentro del marco del poder de ordenar coherentemente el uso de las tierras, la Junta debe centrarse en fomentar la salud, la seguridad, el orden, la convivencia y la prosperidad del país.[12]

Para hacer realidad esta encomienda de planificación integral, la Asamblea Legislativa le otorgó a la Junta el poder de zonificar las distintas áreas de nuestra isla. La zonificación es el instrumento que utiliza la Junta para clasificar los terrenos en zonas o distritos, con el fin de aplicar normas generales sobre su uso y definir las características de las obras y edificaciones permitidas.[13] El acto de adoptar o enmendar la zonificación de un

---

[11] Art. 4 de la Ley Orgánica de la Junta de Planificación de Puerto Rico, Ley Núm. 75 de 24 junio de 1975. 23 L.P.R.A. sec. 62(c).

[12] *Íd.*

[13] Mun. de San Juan v. Bosque Real, S.E., 158 D.P.R. 743, 761 (2003).

distrito es un ejercicio del poder de reglamentación delegado en la Junta.[14] Dicha facultad le confiere a esta agencia central una gran discreción en el desarrollo y en la ejecución de la política pública sobre zonificación.[15] Los reglamentos y mapas de zonificación aprobados con ese fin pretenden promover el uso más eficaz del limitado recurso de la tierra, de forma que se promueva el desarrollo urbano de manera ordenada y lógica. Esto, a su vez, requiere sopesar las diversas necesidades de la población puertorriqueña.[16] Como consecuencia de su facultad de guiar el desarrollo físico, económico y social del país, la Junta tiene poderes amplios, como el de prohibir determinados usos y tomar medidas provisionales y

---

[14] (23 L.P.R.A. sec. 62j(5)). Borschow Hosp. v. Junta, 177 D.P.R. 545, 557 (2009), T-JAC, Inc., v. Caguas Centrum Limited, 148 D.P.R. 70, 83 (1999). Además, la Sección 1.3 de la Ley de Procedimiento Administrativo Uniforme, define un reglamento como "cualquier norma o conjunto de normas de una agencia que sea de aplicación general que ejecute o interprete la política pública o la ley". 3 L.P.R.A. sec. 2102(l).

[15] Aner Inv. Co., v. Junta, 148 D.P.R. 241, 247 (1999), Assoc. Res. Park Side, Inc., v. Junta, 147 D.P.R. 277, 284 (1998), Arenas Procesadas, Inc., v. E.L.A., 132 D.P.R. 593, 608 (1993); Luán Investment, Co., v. Román, 125 D.P.R. 533, 548 (1990).

[16] 23 L.P.R.A. sec. 62(c). Además, este Tribunal ha declarado que "[l]a planificación es una disciplina integradora que busca sopesar la más diversa conjugación de factores con el fin de garantizar un desarrollo racional y balanceado del área en cuestión y que la misma sea a su vez cónsona con los desarrollos propuestos o vislumbrados para la región, áreas circundantes y el desarrollo del país". Carabarín v. A.R.P.E., 132 D.P.R. 938, 954-955 (1993).

preventivas para lograr el uso óptimo, tanto social como ambiental, de los terrenos del país.[17]

Existen dos vías procesales para que el proponente de un proyecto someta ante la consideración de la Junta una solicitud de rezonificación de un predio. En primer lugar, puede promoverse dicho cambio directamente mediante una solicitud de rezonificación directa.[18] También puede solicitarse este cambio de forma indirecta, mediante la presentación de una consulta de ubicación cuya aprobación conllevaría alterar la zonificación de un predio.[19] No obstante, hemos expresado en reiteradas ocasiones que, debido a nuestra realidad social y territorial, el Estado

---

[17] Puerto Rican Cement v. Junta, 146 D.P.R. 428, 437 (1998).

[18] Hernández, Álvarez v. Centro Unido, 168 D.P.R. 592, 619-620 (2006); López v. Antonio Roig Sucrs., Inc., 157 D.P.R. 186, 194 (2002).

[19] Reglamento de Zonificación de Puerto Rico Núm. 6211 (Reglamento de Planificación Núm. 4), 5 de noviembre de 2000, Sección 4.09, pág. 50-51. La consulta de ubicación es definida como "[e]l procedimiento ante la Junta de Planificación para que evalúe, pase juicio y tome la determinación que estime pertinente sobre: (a) propuestos usos de terrenos que no son permitidos ministerialmente por la reglamentación aplicable en áreas calificadas, pero que las disposiciones reglamentarias o legales proveen para que se consideren por la Junta de Planificación…" Glosario de Términos de los Reglamentos de Planificación, Reglamento Núm. 7630, de 11 de diciembre de 2008, C-100, pág. 37. Véase, además, Borschow Hosp. v. Junta, supra, a la pág. 557, T-Jac, Inc. v. Caguas Centrum Ltd., supra, a la pág. 85, Misión Ind. P.R. v. Junta, 146 D.P.R. 64, 117-118 (1998).

se ve obligado, en lo posible, a mantener las zonificaciones existentes.[20]

El Reglamento de Zonificación de Puerto Rico 6211, Reglamento de Planificación Núm. 4, de 5 de noviembre de 2000, en vigor al momento de concretarse y atenderse el procedimiento de consulta de ubicación en este caso, requiere que se cumplan ciertos requisitos.[21] Entre estos se encuentran la notificación adecuada a los dueños de las propiedades colindantes y la presentación del plano de construcción que muestre una representación gráfica del proyecto.[22] Al considerar y resolver una consulta de ubicación, la Junta ejerce una función de naturaleza cuasi-adjudicativa, por lo cual deberá resolver a base de la totalidad del expediente, mediante una resolución que incluya las determinaciones de hechos y las conclusiones de derecho pertinentes, junto a los endosos emitidos. La Junta

---

[20] Hernández, Álvarez v. Centro Unido, supra, a la pág. 617, Ortiz Gómez et al. v. Junta, 152 D.P.R. 8, 17 (2000), Montoto v. Lorie, supra, a la pág. 43.

[21] La primera consulta de ubicación fue presentada ante la Junta de Planificación en 2001 y resuelta en 2002, mientras que la enmienda a la consulta de ubicación fue resuelta mediante Resolución en 2004. Por tanto, al momento de los hechos, el reglamento vigente era el Reglamento de Zonificación de Puerto Rico 6211 (Reglamento de Planificación Núm. 4), supra.

[22] Sección 4.09 del Reglamento de Zonificación 6211 (Reglamento de Planificación Núm. 4), supra, págs. 50-51. Véase, además, las Sección 7.00, 8.00, 9.00 y 10.00 del Reglamento Adjudicativo Núm. 6031, Reglamento de Procedimientos Adjudicativos de la Junta de Planificación de 13 de octubre de 1999, págs. 26-43.

deberá considerar, además, los documentos pertinentes de política pública sobre la planificación como lo son, entre otros, el Plan de Desarrollo Integral, los Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico y los Planes de Ordenación Territorial municipales, adoptados por la Junta y aprobados por el Gobernador.[23]

En 1975, la Asamblea Legislativa relevó a la Junta de sus responsabilidades fiscalizadoras y operacionales para permitirle dedicar sus esfuerzos y recursos a las determinaciones de política pública y las estrategias de desarrollo físico, económico y social del país.[24] A esos fines, la Ley Núm. 76 de 24 de junio de 1975, mejor conocida como Ley Orgánica de la Administración de Reglamentos y Permisos, en adelante, A.R.P.E., creó esta agencia central para ejercer como brazo operativo de planificación.[25] En particular, el Artículo 5(p) de su ley orgánica impuso a A.R.P.E. el deber de entender en la fase

---

[23] <u>Misión Ind. P.R. v. Junta,</u> supra, a las págs. 128-129, <u>Montalvo v. Mun. de Sábana Grande,</u> 138 D.P.R. 483, 488-489 (1995), <u>Luán Investment Corp. v. Román</u>, supra, a la pág. 547, nota al calce número 2, <u>López v. Junta</u>, 80 D.P.R. 646, 667-669 (1958).

[24] <u>Asoc. Por Bienestar Vecinos Urb. Huyke v. Banco Santander</u>, 157 D.P.R. 521, 550 (2002), <u>The Richards Group v. Junta</u>, 108 D.P.R. 23, 31-32 (1978).

[25] Ley Núm. 76 del 24 de junio de 1975, 23 L.P.R.A. sec. 71 *et seq.* Debemos señalar que la Ley Orgánica de la Administración de Reglamentos y Permisos, supra, fue derogada por la Ley Núm. 161 de 1 de diciembre de 2009, mejor conocida como Ley para la Reforma del Proceso de Permisos de Puerto Rico. 23 L.P.R.A. sec. 9011 *et seq.*

operacional del proceso de permisos, es decir, su misión principal es:

> Aplicar y velar el cumplimiento de sus propios reglamentos, de los Reglamentos de Planificación que haya adoptado o adopte la Junta de Planificación de Puerto Rico para el desarrollo, subdivisión y uso de terrenos y para la construcción y uso de edificios, así como el cumplimiento de toda ley estatal, ordenanza, o reglamentación de cualquier organismo gubernamental que regule la construcción en Puerto Rico.[26]

En esencia, la fase operacional de planificación es posterior a la aprobación del proyecto por la Junta. Se inicia con la presentación de una solicitud de desarrollo y conlleva revisar la viabilidad del proyecto en su fase de implantación. Esta etapa es de índole especialmente técnica; requiere estudiar los pormenores del proyecto, conforme los requisitos de zonificación del distrito, y las complejidades físico-espaciales y sociales que genere un uso específico de terreno, así como la conformidad de las estructuras a erigirse con las normas y los requisitos de construcción, entre otros asuntos. En el contexto de una consulta de ubicación, la fase operacional persigue corroborar que los detalles particulares del proyecto se adhieran a lo dispuesto en la resolución de la Junta.[27]

---

[26] 23 L.P.R.A. sec. 71d(p).

[27] Véase, Glosario de Términos de los Reglamentos de Planificación, supra, F-9, pág. 60.

La Ley Núm. 81 de 30 de agosto 1991, mejor conocida
como Ley de Municipios Autónomos,[28] cristalizó una reforma
municipal que permitió la delegación a los gobiernos
locales de una amplia gama de poderes y competencias de
diversas agencias de la administración central, entre éstas
la Junta y A.R.P.E. Esta reforma fue dirigida
específicamente a fomentar la autonomía gestora del ente
gubernamental local para que éste pudiese velar por el bien
común de sus habitantes, así prestando atención de forma
directa a sus asuntos, problemas y necesidades colectivas
de forma más eficaz.[29] Esta política pública estatal de
descentralización gubernamental, que ha estado en vigor por
dos décadas, enfatiza la importancia de la planificación
local como un apoyo a la autonomía del municipio, el cual
ha sido, tradicionalmente, el lugar preferente de las
prácticas democráticas.[30]

---

[28] Ley Núm. 81 de 30 de agosto de 1991. 21 L.P.R.A. sec. 4001, et seq.

[29] Véase, el Artículo 4 de la Ley de Municipios Autónomos, supra. 21 L.P.R.A. sec. 4003.

[30] Esta política pública va "dirigida a proporcionar un uso juicioso y aprovechamiento óptimo del territorio municipal para asegurar el bienestar de las generaciones actuales y futuras, promoviendo un proceso de desarrollo ordenado, racional e integral de sus terrenos". Memorial Explicativo del Reglamento sobre los Planes de Ordenación Municipal y Transferencia y Administración de Facultades, (Reglamento de Planificación Núm. 24) de 20 de mayo de 1994. Véase, Borschow Hosp. v. Junta, supra, J. Punsoda Díaz, supra, a la pág. 142.

Así, la Ley de Municipios Autónomos, entre otras cosas, le permite a los municipios asumir, mediante delegación, algunas de las facultades tradicionales de la Junta y A.R.P.E.[31] Estas facultades se clasifican por "Jerarquías", de la I a la V, de acuerdo a su grado de complejidad y la capacidad municipal para asumirlas. Entre las facultades y poderes transferidos, la Junta, en su capacidad de agencia estatal supervisora y coordinadora de la ordenación territorial, le delega a los municipios autónomos el poder de "[e]stablecer política, estrategias y planes dirigidos a la ordenación de su territorio, la conservación de sus recursos y su óptimo desarrollo".[32] La Ley de Municipios Autónomos también reconoce que una vez transferida una facultad, "el municipio asumirá toda responsabilidad por las acciones tomadas en el ejercicio de esa facultad".[33]

La Asamblea Legislativa le confirió a los municipios autónomos la potestad de ordenar su territorio municipal mediante la adopción de un Plan de Ordenación Territorial.[34]

---

[31] Municipio de Ponce v. Junta. 146 D.P.R. 650, 654 (1998). Véase, 21 L.P.R.A. sec. 4602.

[32] Artículo 2.004 de la Ley de Municipios Autónomos, supra. 21 L.P.R.A. § 4054 (h).

[33] 21 L.P.R.A. sec. 4610.

[34] El Artículo 13.004 de la Ley de Municipios Autónomos, supra, define al Plan de Ordenación Territorial como la organización "de usos, bienes inmuebles y estructuras de un territorio para ordenarlo en forma útil, eficiente y

Éste es el instrumento de ordenación integral y estratégico del territorio municipal,[35] que enuncia y dispone la política pública sobre su desarrollo y sobre el uso de sus suelos.[36] De esta forma, un municipio autónomo puede recibir, mediante delegación, el poder de calificar y recalificar sus suelos; es decir, la facultad de "clasificar y designar terrenos en distritos y la aplicación en cada distrito de normas sobre el uso de los suelos y sobre las obras y estructuras a permitirse".[37] Cabe resaltar que el poder de calificación de un municipio autónomo es equivalente al poder de zonificación de la Junta.[38]

El desarrollo de un Plan de Ordenación Territorial requiere el estudio y la recopilación de un complejo entramado de documentos, cuyo contenido revela un minucioso análisis de la realidad socio-espacial del municipio. El

---

estética, con el propósito del desarrollo social y económico, lograr el buen uso de los suelos y mejorar la calidad de vida de sus habitantes presentes y futuros." 21 L.P.R.A. sec. 4601 (n).

[35] Artículo 13.005 de la Ley de Municipios Autónomos, supra. 21 L.P.R.A. sec. 4603.

[36] 21 L.P.R.A. sec. 4054 (s). Véase, además, el Artículo 13.003(s) de la Ley de Municipios Autónomos, supra. 21 L.P.R.A. sec. 4601.

[37] Plan de Ordenación Territorial del Municipio Autónomo de Guaynabo, Vol. III, Reglamento de Calificación de Suelos del Municipio Autónomo de Guaynabo, Sección 2.00, pág. 8.

[38] Glosario de Términos de los Reglamentos de Planificación, Reglamento Núm. 7630, de 11 de diciembre de 2008, C-7, pág. 24.

Artículo 13.011 de la Ley de Municipios Autónomos dispone que en la elaboración del Plan de Ordenación Territorial, un municipio autónomo deberá identificar los reglamentos, si alguno, de la Junta o de A.R.P.E., que deben revisarse y ajustarse a su entorno territorial. Sin embargo, el municipio autónomo que pretenda enmendar o sustituir algún reglamento adoptado por las agencias centrales deberá discutir y fundamentar dicha decisión.[39]

Dentro de este marco de cooperación, los municipios autónomos se sirven de su propio Plan de Ordenación Territorial para reglamentar el uso de los terrenos en sus límites geográficos.[40] La ordenación integral y estratégica de la totalidad del territorio municipal debe estar en conformidad con todas las políticas públicas, leyes, reglamentos y otros documentos del gobierno central relacionados con la ordenación territorial.[41] Este Plan de

---

[39] Artículo 13.011 de la Ley de Municipios Autónomos, supra. 21 L.P.R.A. sec. 4609.

[40] Borschow Hosp. v. Junta, supra, a las págs. 560-561. Artículo 13.008 de la Ley de Municipios Autónomos, supra. 21 L.P.R.A. sec. 4606. Véase, además, la expresión del Secretario de Justicia, quien nos señala que "[l]a función de planificación y ordenación de los usos del terreno recaía casi exclusivamente en la Junta de Planificación previa [sic] la aprobación de la Ley de Municipios Autónomos, **y queda ahora compartida por los municipios, a los cuales se les han conferido las facultades y responsabilidades para llevarlo a cabo, en coordinación con las agencias del Gobierno Central**". (Énfasis nuestro). Op. Sec. Just. Núm. 17 de 1992.

[41] Artículo 13.011 de la Ley de Municipios Autónomos, supra. 21 L.P.R.A. sec. 4609. Véase, Reglamento de Ordenación

Ordenación Territorial, junto a los planos de clasificación y ordenación del suelo, son instrumentos complementarios al Plan de Usos de Terrenos de Puerto Rico, hasta donde éste haya sido aprobado por la Junta.[42]

Por otro lado, la Ley de Municipios Autónomos reconoce, en su Artículo 13.012, que la facultad cuya transferencia sea autorizada mediante el convenio se ejercerá de acuerdo no solamente a las normas y procedimientos establecidos en la legislación, reglamentación y política pública aplicable a la facultad transferida,[43] sino conforme a la Ley Núm. 170 de 12 de agosto de 1988, mejor conocida como la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.).[44] Esta ley define el ámbito de la facultad revisora de los tribunales sobre las determinaciones cuasi-adjudicativas de las agencias

---

Núm. 4, el cual dispone que "[s]e aprobarán solicitudes y se expedirán los permisos o autorizaciones que correspondan **con sujeción a las disposiciones de las leyes y reglamentos aplicables** y de acuerdo con lo establecido en este reglamento". (Énfasis nuestro). Sección 4.14 del Reglamento para Regir las Disposiciones Sustantivas, Procesales y de Procedimientos Adjudicativos de la Oficina de Permisos del Municipio Autónomo de Guaynabo, junio 2000.

[42] Éste es el documento de política pública adoptado por la Junta de Planificación, el cual, "dependiendo de su alcance geográfico y propósito, designará la distribución, localización, extensión e intensidad de los usos del suelo y otros elementos, tales como la infraestructura para propósitos urbanos, rurales, agrícolas…" 21 L.P.R.A. sec. 4054(r).

[43] 3 L.P.RA. sec. 2101 *et seq*.

[44] 21 L.P.R.A. sec. 4610.

públicas. De esta forma, reconoce que es responsabilidad de los foros judiciales asegurarse de que el ente administrativo actúe dentro del marco de los poderes que le han sido delegados, y en conformidad con la política pública que lo dirige.[45] La revisión judicial garantiza a los ciudadanos y a las partes interesadas un foro al cual recurrir para vindicar sus derechos y reclamar un remedio frente a posibles actuaciones arbitrarias de las agencias públicas en un dictamen administrativo.[46]

III.

### A. Facultad de la Junta de Planificación y del Municipio Autónomo para Recalificar el Suelo Municipal mediante Consulta de Ubicación

El Municipio presenta la controversia del caso de autos como un conflicto insalvable entre sus poderes cuasi-legislativos de elaborar y revisar su Plan de Ordenación Territorial y el poder cuasi-adjudicativo de la Junta de aprobar una consulta de ubicación en el territorio municipal. Alega que el poder de recalificar directamente sus terrenos le fue conferido expresamente mediante el Convenio de Transferencia de Competencias y que la Junta no

---

[45] D. Quiñones Fernández, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 2da Ed., Forum, Legis Editores S.A., Colombia, 2001, pág. 517.

[46] Comisión Ciudadanos v. G.P. Real Property, 173 D.P.R. 998, 1015 (2008), Rivera Concepción v. A.R.P.E., 152 D.P.R. 116, 122 (2000), Misión Ind. P.R. v. J.C.A., supra, a la pág. 930, Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., 144 D.P.R. 425, 435 (1997).

se reservó el poder de recalificar indirectamente los terrenos municipales. Por tanto, el Municipio entiende que la intervención de la Junta violentó el postulado mayor de la reforma municipal, es decir, la autonomía del municipio en los asuntos de su planificación. Como alternativa arguye, además, que la intervención de la Junta en el proceso de recalificar el suelo en su demarcación se podía dar únicamente a través del mecanismo establecido en el Artículo 13.008 de la Ley de Municipios Autónomos para la revisión de un Plan de Ordenación Territorial municipal.

Cuando existe un conflicto sobre si se ha delegado una competencia de la Junta o A.R.P.E. a un municipio autónomo, junto a su posterior interacción administrativa, es preciso examinar la Ley de Municipios Autónomos, el Convenio de Transferencia de Competencias y los reglamentos pertinentes. De esta forma podremos analizar la naturaleza de las funciones del ente local y su relación con la agencia central para encontrar, dentro del entramado de mandatos y responsabilidades, el sentido de la delegación enmarcada por la Asamblea Legislativa y lo pactado entre ambos entes gubernamentales.

El Plan de Ordenación Territorial del Municipio Autónomo de Guaynabo fue aprobado por la Legislatura

Municipal, el 11 de diciembre de 1998.[47]  La Junta lo adoptó

al año siguiente, el 16 de noviembre de 1999,[48] mientras que

el Gobernador de Puerto Rico lo firmó y aprobó el 15 de

diciembre de 1999.[49] Conforme al Artículo 13.012 de la Ley

de Municipios Autónomos, el Municipio solicitó al primer

Ejecutivo la transferencia de ciertas facultades sobre la

ordenación territorial y pactó con el Gobierno central,

mediante el Convenio de Transferencia de Competencias de 16

de noviembre de 2000, la concesión de las facultades de

planificación contenidas en las Jerarquías I, II, III y

IV.[50]

Este convenio estaba en vigor cuando Unlimited

presentó la consulta de ubicación original y también cuando

presentó la solicitud de enmienda ante la Junta.  Con

excepción de las competencias reservadas expresamente por

la Junta y A.R.P.E.,[51] las Jerarquías I, II, III y IV le

---

[47] Ordenanza Municipal Núm. 78, Serie 1998-99, de 11 de diciembre de 1998.

[48] Resolución Núm. JP-PT-16-1, del 16 de noviembre de 1999.

[49] Boletín Administrativo Núm. OE-1999-63, de 15 de diciembre de 1999.

[50] Ordenanza Municipal Núm. 127, Serie 2000-2001, de 16 de noviembre de 2000.

[51] La Ley de Municipios Autónomos establece que la Junta y A.R.P.E. se reservan la facultad de atender los proyectos que conlleven variaciones de uso y variaciones de intensidad en construcción o uso, los proyectos privados y públicos de impacto regional, al igual que los proyectos municipales no delegados, que no hayan sido incluidos en el

confirieron al Municipio la facultad de aprobar permisos de uso en estructuras que estuviesen conformes con los reglamentos de planificación, siempre que no constituyesen una variación o excepción. Además, le confirieron la facultad de autorizar ciertos anteproyectos, segregaciones de hasta 10 solares en suelo urbano o urbanizable y proyectos de urbanización de hasta 50 solares, así como enmendar el Plano de Ordenación. Resaltamos que a esa fecha no se había transferido la Jerarquía V, que permite conceder al Municipio "otras facultades" que no fueran expresamente reservadas por las agencias centrales.[52] Es claro, pues, que no se le había delegado al Municipio el poder de aprobar una consulta de ubicación.

Ciertamente, tanto el texto de la Ley de Municipios Autónomos, como las jerarquías transferidas en el Convenio de Transferencia de Competencias, guardan silencio sobre la delegación de la facultad de recalificar indirectamente un

_____

Plan de Ordenación. Artículo 13.012 de la Ley de Municipios Autónomos, supra. 21 L.P.R.A. sec. 4610.

[52] El Programa para la Transferencia de las Jerarquías dispone que a los seis meses de la fecha de vigencia del convenio la Junta de Planificación y A.R.P.E. realizarán una evaluación preliminar de la labor del municipio autónomo en el ejercicio de las Jerarquías I, II, III y IV. Posteriormente, al año de esta primera transferencia se realizará una segunda evaluación para determinar si las primeras cuatro jerarquías fueron debidamente implantadas. De ser ese el caso, la Junta de Planificación y A.R.P.E. le podrán conceder al municipio autónomo, mediante Resolución, la Jerarquía V. Parte III Sección C(2) del Convenio de Transferencia de Competencias de 28 de noviembre de 2000, supra, a las págs. 13-14.

predio municipal. Este punto es crucial a la luz del inciso (P) de las condiciones generales del Convenio de Transferencia de Competencias, el cual reconoce que "**las facultades** en la materia que **no se delegan expresamente mediante este Convenio, continúan siendo facultad de la Junta de Planificación** o de la Administración de Reglamentos y Permisos[,] según corresponda".[53] Es más, el pacto entre el ente local y las agencias centrales establece claramente que "**[e]l Municipio asumirá toda la responsabilidad sobre las primeras cuatro (IV) Jerarquías indicadas en este Convenio** al momento de entrar en vigencia el mismo".[54] Por otro lado, la Sección (B)(1)(c) de la Parte VI, que concierne las medidas de coordinación y fiscalización entre la Junta y el Municipio, dispone que todas las consultas de ubicación privadas serán presentadas en el Municipio y que éste someterá el expediente a la agencia central con jurisdicción, a no más tardar, 10 días después de la presentación.[55]

Como vemos, se trata de un convenio cuya finalidad es delegar de forma expresa ciertas funciones de planificación, según la capacidad y eficiencia que

---

[53] (Énfasis nuestro). *Íd.*, a la pág. 19.

[54] (Énfasis nuestro). *Íd.*, a la pág. 13.

[55] *Íd.*, a la pág. 26.

demuestre el municipio autónomo.[56] Por eso, no podemos presumir que el silencio legislativo le conceda exclusivamente el poder de recalificación al ente municipal o que le impida a la Junta ejercerlo. En realidad, además del Convenio de Transferencia de Competencias, la contención del Municipio contradice explícitamente los propios reglamentos adoptados por éste. La Sección 2.00 del Reglamento de Calificación de Suelos del Municipio Autónomo de Guaynabo (Reglamento de Calificación Núm. 3),[57] lee de la forma siguiente: "**[e]l Municipio o la Junta de Planificación, según corresponda, evaluará las consultas de ubicación tomando en consideración el nivel de autonomía, facultades transferidas o jerarquías obtenidas a través del Convenio negociado** entre las partes".[58]

---

[56] "El [C]onvenio [de Transferencia de Competencias] podrá establecer limitaciones en las facultades delegadas, de acuerdo a la capacidad del municipio". Artículo 13.012 de la Ley de Municipios Autónomos, supra. 21 L.P.R.A. sec. 4610.

[57] Este reglamento está basado en el Reglamento de Zonificación de Puerto Rico Núm. 4844, de 16 de septiembre de 1992, (Reglamento de Planificación Núm. 4) de la Junta de Planificación, el cual sufrió leves modificaciones. Plan de Ordenación Territorial del Municipio Autónomo de Guaynabo, Vol. I, Cap. V, supra, pág. 128.

[58] (Énfasis nuestro). Sección 2.00 del Reglamento de Calificación de Suelos del Municipio Autónomo de Guaynabo, supra, pág. 11. Además, la Sección 4.05 de este reglamento dispone cuál será el tamaño máximo permitido para que una propiedad pueda ser recalificada directa o indirectamente. En el caso de una propiedad que está calificada como R-3, al igual que C-3, el tamaño límite será de 2,000 metros cuadrados. Esta sección dispone claramente que cualquier solicitud para recalificar un predio que exceda del límite

En cuanto al desenlace del procedimiento de recalificación indirecta de un distrito o solar, la Sección 4.06 del Reglamento de Calificación dispone que:

> **Cuando se trate de un uso previamente autorizado por el Municipio o la Junta [de Planificación], según corresponda, para el cual se hubiere celebrado vista pública, notificado la intención de cambiar el distrito de calificación y expedido el permiso de uso,** la parte interesada podrá iniciar el procedimiento de cambio en el mapa de calificación sometiendo una copia del permiso de uso certificado y autorizado por la Administración de Reglamentos y Permisos **como evidencia de que el mismo se construyó y se autorizó su uso conforme a las disposiciones de la consulta [de ubicación]. Cuando se verifique que la consulta [de ubicación] se culminó, el Municipio o la Junta [de Planificación], según corresponda, podrá enmendar el mapa sin necesidad de nueva vista.**[59]

Es decir, el Reglamento de Calificación de Suelos adoptado por el ente municipal dispone para que tanto el Municipio como la Junta puedan recalificar indirectamente un distrito o solar dentro de los límites territoriales de un municipio autónomo, **conforme a lo pactado con el Gobierno central.** En el caso de autos, el Municipio

---

prescrito deberá ser atendida conforme al trámite dispuesto para los desarrollos extensos. Secciones 94.00, 95.00 y 96.00 del Reglamento de Calificación de Suelos del Municipio Autónomo de Guaynabo, supra.

[59] (Énfasis nuestro). Sección 4.06 del Reglamento de Calificación de Suelos del Municipio Autónomo de Guaynabo, Vol. III del Plan de Ordenación Territorial del Municipio Autónomo de Guaynabo, supra, pág. 48.

simplemente no había adquirido dicha facultad al momento de someterse la enmienda a la consulta de ubicación. Por tanto, no cabe hablar de un acto ilegal por parte de la Junta.

Más aún, al renovarse el Convenio de Transferencia de Competencias, para transferir al Municipio ciertos poderes bajo la Jerarquía V, el nuevo pacto tampoco le delegó al ente municipal el poder de aprobar consultas de ubicación.[60] Lo anteriormente discutido deja en entredicho el argumento del Municipio en torno a que la recalificación de los suelos municipales deberá llevarse a cabo, forzosamente, a petición del Municipio y a través del mecanismo de revisión del Plan de Ordenación Territorial dispuesto por el Artículo 13.008 de la Ley de Municipios Autónomos. Recordemos que tanto el mecanismo de recalificación directa, como el de recalificación indirecta, son instrumentos de planificación que le permiten al municipio

---

[60] El convenio de 14 de junio de 2005 establece que se transferirán "[o]tras facultades de la Administración de Reglamentos y Permisos y de la Junta de Planificación no incluidas en este Convenio **y que se incorporen posteriormente mediante enmiendas al mismo, excepto: … [c]onsultas de [u]bicación para proyectos industriales, comprende la ubicación de consultas [sic] para fines industriales específicos, así como la formación de solares para dichos fines**". (Énfasis nuestro). Parte II (A)(5)(l)(iii) del Convenio de Transferencia de Competencias del Municipio Autónomo de Guaynabo, 14 de junio de 2005, págs. 12-13. Cabe señalar que del expediente no se desprende prueba alguna sobre la existencia de una enmienda al Convenio de Transferencia de Competencias de 2005 que delegue expresamente al Municipio el poder de aprobar una consulta de ubicación.

autónomo y a la Junta ser más flexibles a la hora de asegurar el uso óptimo de sus terrenos. Claramente, el poder delegado al Municipio para recalificar directamente sus suelos no es un impedimento para que la Junta ejerza la facultad retenida de aprobar consultas de ubicación que constituyan, a su vez, una recalificación indirecta.

Ahora bien, es menester que distingamos las diversas facultades delegadas al Municipio y cómo deben emplearse. Recalcamos que mediante el Convenio de Transferencia de Competencias se le delegaron, parcialmente, los poderes de planificación y de enunciación de política pública respecto a su demarcación territorial, junto a ciertas facultades relativas a los asuntos operacionales normalmente atendidos por A.R.P.E. En lo que a este caso concierne, al delegarse la Jerarquía V mediante el nuevo Convenio de Transferencia de Competencias, aprobado el 14 de junio de 2005, se confirió al Municipio la facultad operacional de atender solicitudes de anteproyectos como la que sometió Unlimited.[61]

---

[61] Específicamente se transfirieron las solicitudes de "autorización de "[d]esarrollo preliminar, **Anteproyecto** y Permiso para la construcción o uso de proyectos privados o municipales de carácter residencial, comerciales, industriales, institucionales, agrícolas, agroindustriales, **que constituyan Desarrollos Extensos, siempre y cuando sean permitidos ministerialmente, de acuerdo con el Reglamento de Ordenación vigente, o esté conforme con los parámetros de la consulta aprobada por la Junta de Planificación,** pero que no implique variaciones de uso y variaciones de intensidad en construcción o uso". Parte II (A)(5)(h) del

De esa forma, facultades que están nítidamente separadas a nivel estatal mediante las leyes orgánicas de la Junta y A.R.P.E. se encuentran ahora entrelazadas en una sola agencia local. Aunque el andamiaje municipal tiende a divergir de la bifurcación de poderes de planificación a nivel estatal, el Municipio viene obligado a ejercer dichas facultades **en el contexto de la solicitud presentada y conforme a la etapa en la cual se encuentra el proyecto** que está ante su consideración. Por tanto, el Municipio no puede sobrepasarse de las facultades extendidas mediante su Convenio de Transferencia de Competencias e invadir las prerrogativas que por mandato contractual le pertenecen únicamente a la Junta.

En Hatillo Cash & Carry v. A.R.Pe.,[62] este Tribunal dictaminó que A.R.P.E. actuó en contra de los poderes que le fueron delegados a través de su ley orgánica, al aprobar una fracción de un proyecto que había sufrido diversas y sustanciales alteraciones, como si se tratara del proyecto originalmente aprobado por la Junta, cuando lo que correspondía era una enmienda a la consulta de ubicación original. En aquella ocasión aclaramos que el poder de realizar determinaciones de política pública no era

---

Convenio de Transferencia de Competencias del Municipio Autónomo de Guaynabo, 14 de junio de 2005, pág. 11. (Énfasis nuestro).

[62] Hatillo Cash & Carry v. A.R.P.E., 173 D.P.R. 934 (2008).

delegable a A.R.P.E., y que esa agencia, en su función de velar por el fiel cumplimiento de las leyes y reglamentos de planificación, no podía arrogarse las funciones de desarrollo estratégico que mantenía la Junta.[63]

Concretamente, el Municipio está facultado, de forma delimitada y subordinada a la coordinación con la Junta, para hacer determinaciones de política pública dentro de su demarcación territorial. No obstante, ello no significa que al intervenir en el caso de autos, podía ignorar la etapa procesal en la que se encontraba el trámite. El Municipio no podía obviar que a ese momento la Junta había ejercido debidamente la facultad, aún no delegada mediante el Convenio de Transferencia de Competencias, de recalificar indirectamente el suelo municipal al autorizar la consulta de ubicación.

Debido a que el Municipio pactó expresamente respetar las facultades no delegadas por las agencias centrales, es indudable que resultaría contrario a derecho, a nuestra jurisprudencia y a la propia Ley de Municipios Autónomos, interpretar que el ente municipal, con funciones y facultades claramente prescritas, podía revocar *de facto* una decisión final y firme emitida por la Junta. Esta conclusión es reforzada por el hecho que no estamos ante una revisión judicial de la resolución aprobando la

---

[63] *Íd.*, a las págs. 955-956.

consulta de ubicación. El expediente es claro en que el Municipio fue notificado de la determinación emitida por la Junta y, como agencia local interesada en el cumplimiento de su propia política pública municipal, tenía el deber ministerial de agotar los remedios administrativos o de presentar un recurso de revisión judicial si estimaba que el proyecto no cumplía con dichos postulados.[64]

### B. La Política Pública y la Revisión del Plan de Ordenación Territorial

Finalmente, nos toca atender la razón medular por la cual el Municipio denegó la autorización del anteproyecto; es decir, que el acto cuasi-legislativo de revisar su Plan de Ordenación Territorial le obligaba a aplicar sus nuevas políticas públicas sobre el uso de sus terrenos.

De forma introductoria, el Municipio arguye que su endoso al proyecto presentado por Unlimited no era determinante en la etapa de consulta de ubicación, por lo cual el alcance y significado de dicho endoso no debe sobrevalorarse. Esta aseveración la fundamenta en la naturaleza preliminar de un endoso a nivel de consulta de ubicación, el cual, según alega, no le ata inexorablemente

---

[64] Véase, además, la Sección 4.2 de la Ley de Procedimiento Administrativo Uniforme la cual reza que la revisión judicial "...será el recurso exclusivo para revisar los méritos de una decisión administrativa sea ésta de naturaleza adjudicativa o de naturaleza informativa emitida al amparo de este capítulo". 3 L.P.R.A. sec. 2172.

o le impide modificar su posición en etapas posteriores como lo es la etapa operacional.

El Reglamento Núm. 7630, mejor conocido como Glosario de Términos de los Reglamentos de Planificación, define el endoso como una "[r]ecomendación favorable de un organismo gubernamental concernido y con jurisdicción con relación a un proyecto, pudiendo ésta ser precisa o de carácter general o estar relacionada al cumplimiento de determinados requisitos, suministro de datos y otras gestiones".[65] El Reglamento también distingue entre el endoso preliminar y el endoso final. El endoso preliminar es una "[r]ecomendación de carácter general que se limita a señalar las facilidades existentes, su capacidad y los puntos de conexión o de accesos o señalar medidas, precauciones o forma de ejecución a observarse al realizar la obra en beneficio del interés público"; mientras que el endoso final es aquella "[a]probación favorable de un organismo gubernamental concernido, con relación a la aceptación de obras construidas o que pueden ser utilizadas".[66] El endoso emitido por el Municipio, el 12 de noviembre de 2003, lee de la manera siguiente:

> **El desarrollo de este proyecto es compatible [con] las estipulaciones de la Política Pública Municipal para el**

---

[65] Glosario de Términos de los Reglamentos de Planificación, supra, E.16, pág. 52.

[66] *Íd.*, E.17-18, págs. 52-53.

> **Suelo Urbano (SU) según el Plan de Ordenación Territorial** de la siguiente manera: **Prom[ueve] el desarrollo de usos no residenciales en lugares compatibles, apropiados y adyacentes.** Estimu[la] el redesarrollo de lugares comerciales. Propic[ia] el redesarrollo de lugares céntricos que provean una variedad de servicios.[67]

Sale a relucir del texto citado que éste no es un endoso preliminar. Se trata de un endoso específico y categórico que constata el fiel cumplimiento del proyecto propuesto con la política pública enunciada por el Municipio en su Plan de Ordenación Territorial vigente.

El Convenio de Transferencia de Competencias del Municipio dispone que cuando la Junta retiene o se reserva una facultad, ésta deberá ejercer dicho poder aplicando los reglamentos adoptados por el municipio autónomo, al igual que solicitar al ente municipal comentarios sobre la evaluación de la solicitud que tiene ante sí.[68] Dicho insumo es necesario para mantener intacto el eje central de la política pública de nuestro país en torno a la descentralización del poder ejecutivo: la autonomía municipal. Ahora bien, un endoso municipal no es de por sí obligatorio para la agencia pública que lo recibe. Se trata de una expresión emitida por una autoridad con competencia,

---

[67] (Énfasis nuestro). Misiva del Lcdo. Efraín Pérez Jiménez, Vice-Alcalde del Municipio Autónomo de Guaynabo, 12 de noviembre de 2003.

[68] Véase, Convenio de Transferencia de Competencias de 16 de noviembre de 2000, supra, pág. 15.

cuyo contenido deberá ser evaluado con el debido escrutinio ministerial y tomando en consideración la totalidad de los intereses públicos y privados implicados. Es decir, por más concluyente que sea un endoso en el proceso de aprobar una consulta de ubicación, éste no deja de ser una recomendación, cuyos fundamentos deberán enfrentar la concurrencia o no concurrencia de la agencia autorizada por ley de evaluarlo. Por tanto, el endoso del Municipio en un procedimiento de consulta de ubicación ante la Junta constituye una parte esencial del cúmulo de expresiones que **las agencias públicas deben emitir y que la Junta debe evaluar en miras de cumplir con su deber de coordinar entre sí una planificación íntegra.**[69]

En concordancia con lo indicado anteriormente, el Municipio ejerce en esta instancia dos funciones procesales distintas y separadas. Es evidente que un municipio autónomo puede endosar un proyecto que está ante la consideración de una agencia central en una fase que no le corresponde atender porque no se le ha delegado esa facultad, como sucede en el caso de autos, y luego denegar el proyecto en la subsiguiente etapa operacional, si encuentra un incumplimiento con las leyes y reglamentos aplicables en esa etapa o que el proyecto presentado no es conforme a los parámetros dispuestos en la resolución de la

---

[69] (Énfasis nuestro). 21 L.P.R.A. sec. 4610.

Junta.[70]  Ahora bien, el Municipio defiende su denegación del proyecto de autos al amparo de la facultad que la Junta le delegó para revisar su Plan de Ordenación Territorial. Aduce que los cambios en la política pública municipal conciben el distrito destinado para el proyecto de mini-almacenes como uno de carácter estrictamente residencial.[71] De esta forma, el Municipio concluye que tiene la

---

[70] "La consulta de ubicación, una vez aprobada por la Junta de Planificación, también es un elemento esencial en la toma de decisiones de otras agencias. A esos efectos, la consulta es la descripción de un proyecto de desarrollo particular propuesto para un área específica que provee el marco de referencia en el cual las demás agencias deben medir la viabilidad del proyecto para la aprobación de sus respectivos permisos. T-JAC v. Caguas Centrum, supra, a la pág. 85. Por eso, es importante que los permisos posteriores se mantengan en el marco de lo aprobado por la [Junta de Planificación], en función de sus facultades de guiar la política pública en el ordenamiento territorial". (Énfasis nuestro). Hatillo Cash & Carry v. A.R.P.E., supra, a la pág. 950.  En cuanto a las funciones operacionales de A.R.P.E., que son las que el Municipio viene a ejercer en esta etapa, en ese caso expresamos lo siguiente: "…las disposiciones de la consulta de ubicación que aprueba la Junta de Planificación (JP) establecen los parámetros que A.R.P.E. debe seguir al considerar los permisos siguientes". Íd., a la nota 6.

[71]   "No obstante, la situación dentro del sector, con el tiempo cambió y así lo reflejan las consultas de ubicación residenciales aprobadas por la Junta en los solares colindantes. Este elemento no presente en el 2004 es un efecto acumulativo y de impacto al sector. También cambiaron las políticas públicas que interesa promover el Municipio Autónomo para con su territorio, al amparo de las facultades delegadas bajo la Ley Núm. 81, supra. **El Municipio interesa, al presente, conservar el desarrollo residencial del sector**". (Énfasis nuestro). Petición de *certiorari*, pág. 15. Es menester resaltar que el Municipio no presentó evidencia alguna sobre las alegadas consultas de ubicación residenciales aprobadas en los solares colindantes al del proyecto de Unlimited.

obligación de aplicar el Derecho de planificación conforme a sus nuevas políticas públicas, aunque no estuvieran vigentes al tiempo en que se resuelve el caso de autos.[72] Este señalamiento nos permite auscultar el proceso de revisión de un Plan de Ordenación Territorial y la obligación del Municipio de aplicar el producto final de dicho proceso.

Ciertamente, el Municipio tiene la facultad y el deber de hacer valer las metas y objetivos de su propia ordenación territorial, según se desprende del Artículo 13.005 y el Artículo 13.012 de la Ley de Municipios Autónomos.[73] Concretamente, el Capítulo VI del Plan de Ordenación Territorial del Municipio Autónomo de Guaynabo enuncia la política pública a seguir para su desarrollo futuro. Este título dispone los principios de planificación que afectarán cada categoría de suelo, al igual que define los aspectos básicos de la organización territorial y establece el programa de desarrollo e implementación. La política pública del Municipio sobre el uso del suelo

---

[72] *Íd.*, págs. 24-25.

[73] Véase, además, las condiciones generales del Convenio de Delegación de Competencias, supra, pág. 14, al igual que la Sección 1.07 del Reglamento de Calificación del Municipio Autónomo de Guaynabo (Reglamento de Ordenación Núm. 3), el cual enuncia que las disposiciones de dicho cuerpo reglamentario "… se complementarán e interpretarán a la luz de las políticas públicas establecidas en el Plan de Ordenación Territorial del Municipio Autónomo de Guaynabo.", supra, pág. 2.

urbano busca, entre otros asuntos, propiciar el intercambio socio-económico, maximizar el uso del suelo y conservar el patrimonio cultural, entre otros.[74]

En el proceso de creación o revisión de una política pública hay dos elementos principales: el técnico y el político.[75] En el primero se atiende la recopilación y análisis de datos objetivos, la designación regional de su enfoque y la programación de acciones específicas; mientras que en el segundo se establecen los objetivos concretos, la selección entre varios modelos alternos para alcanzar las metas trazadas y la evaluación de los resultados obtenidos. Sobre este último elemento, el político, que contiene la fase de formulación e implementación de la política pública sobre la planificación, y es el que nos concierne para efectos de adjudicar el caso de autos, nos expresamos hoy por primera vez.

El doctor Punsoda Díaz resalta que los planes de ordenación "son el producto natural del proceso de

---

[74] Plan de Ordenación Territorial del Municipio Autónomo de Guaynabo, Vol. I, El Memorial, 15 de diciembre de 1999, pág. 132.

[75] J. Punsoda Díaz, La Reforma Municipal en Puerto Rico: Retos y Oportunidades, Editores L. Santana Rabell y M. Negrón Portillo, Escuela Graduada de Planificación, U.P.R., San Juan, 1993, pág. 142. Existen, además, diversas doctrinas en torno al estudio de la administración pública. Entre ellas, la fórmula político-administrativa resalta la idea que "…la tarea del Estado es divisible en dos partes, decisión y ejecución, y que la ejecución (Administración) es o puede llegar a ser una ciencia". D. Waldo, Teoría Política de la Administración Pública, Ed. Tecnos, Madrid, 1961, pág. 309.

planificación" y, como tales, "constituyen expresiones detalladas de las acciones necesarias para alcanzar los objetivos establecidos".[76]    La naturaleza de estos documentos denota que el proceso de su elaboración y revisión está revestido de un gran interés público, pues la pureza y transparencia de estos actos administrativos, necesarios para garantizar un funcionamiento gubernamental íntegro y coherente, atañe a nuestra población en general. A su vez, la política pública implantada por el Estado en los planes de ordenación procura dar certeza a las actuaciones administrativas, anclándolos en unos principios, prioridades, metas y objetivos claros, que son esenciales en la justa y eficaz gestión gubernamental.[77] Además, la política pública así plasmada es determinante en la labor diaria de los foros judiciales de adjudicar casos, pues establece parámetros vinculantes que los tribunales tendrán que incorporar en su interpretación de los hechos y en la aplicación del derecho, cuando se ventilen las controversias en los foros pertinentes.[78]

---

[76] J. Punsoda Díaz, supra, a la pág. 144.

[77] "The issues concerning the rule of law are important for the study of implementation because implicit in that concept is the notion that citizens should be able to predict the impact of the actions of the state upon their lives and secure redress when affected by illegitimate actions". M. Hill y P. Hupe, Implementing Public Policy, 2da Ed., Sage Publications, London, 2009, pág. 22.

[78] El profesor Fernández Quiñones nos señala la gran importancia de la política pública en las esferas

La Ley de Municipios Autónomos define la revisión de un Plan de Ordenación Territorial como un proceso de "…recopilación de nuevos datos, inventarios y necesidades; la enunciación de nuevas políticas; o la **promulgación de reglamentos que sustituyan, amplíen o limiten significativamente un Plan de Ordenación vigente**".[79] Se trata, como indica el doctor Punsoda Díaz, de "documentos algo estáticos", por eso, "**es el proceso de planificación continuo y dinámico, y no el documento que contiene el plan, lo que contribuye a facilitar el desarrollo**".[80]

De entrada, reconocemos que el proceso de elaboración y revisión de la política pública es una tarea compleja. Planificar es sinónimo de tomar decisiones. Es marcar prioridades y construir una hoja de ruta en función de

---

administrativas, ya que: "[l]a cultura jurídica normativa fundamenta y orienta la construcción de las políticas públicas, a los efectos de que se establezcan los principios, las guías y los estándares generales que los funcionarios gubernamentales habrán de utilizar en el uso de su discreción y en el ejercicio de sus deberes al administrar la política que corresponda". D. Fernández Quiñones, La Formación de la Política Pública, supra, a la pág. 6. Véase, además, Hernández, Álvarez v. Centro Unido, supra.

[79] (Énfasis nuestro). Artículo 13.003 de la Ley de Municipios Autónomos, supra. 21 L.P.R.A. sec. 4601. Véase, además, la Sección 2.39 del Reglamento sobre los Planes de Ordenación Municipal y la Transferencia y Administración de Facultades de 20 de mayo de 1994, (Reglamento de Planificación Núm. 24).

[80] (Énfasis nuestro). J. Punsoda Díaz, supra, a la pág. 144.

ellas.[81] La misión de un municipio autónomo, que adviene a las facultades y competencias de organizar el uso de sus suelos, es planificar de forma coordinada y coherente la maximización de éstos, conforme a las necesidades que impone su propia realidad social, económica y espacial. El proceso comienza con la identificación de un problema público. A este paso le sigue la consideración de soluciones, o, más bien, el momento en que el ente gubernamental propone diversos métodos y alternativas para atajar el problema público.[82] Acto seguido, se concreta la selección de un marco conceptual para favorecer una medida específica. Estas etapas preliminares se dirigen hacia la implementación, donde finalmente media la asignación de

---

[81] "**[La] planificación, ha de consistir en una actividad racional, en función de la cual se adoptan y aplican decisiones de variado género. El fundamento de la decisión planificadora ha de descansar en los resultados de una amplia y previa labor informativa**, por virtud de la cual la Administración obtenga todos los datos posibles que le permitan valorar los efectos futuros de su decisión, previniendo siempre un margen de error". (Énfasis nuestro). E. Vázquez Bote, <u>Significado auténtico de la planificación democrática como elemento componente de la administración pública del estado de derecho y el problema de su existencia en Puerto Rico</u>, supra, a la pág. 683.

[82] "Policy **formulation refers to the stage of generating options about what to do about a public problem.** Once a government has acknowledged the existence of a public problem and the need to do something about it, that is, once it has entered onto the agenda of government, policy-makers are expected to decide on a course of action to follow in addressing it… **Policy formulation thus involves identifying both the technical and political constraints on state action**". (Énfasis nuestro). M. Howlett, <u>Designing Public Policies: Principles and Instruments</u>, Routledge Ed., Londres, 2011, págs. 29-30.

recursos y la realización de los actos oficiales pertinentes para su entrada en vigor.[83] Podemos apreciar que no se trata de un proceso expedito, ya que conlleva también una constante evaluación, integral o parcial, del marco público elaborado, después de un tiempo indeterminado de funcionamiento, con el fin de realizar los ajustes necesarios que aseguren la corrección del problema social originalmente identificado. Evidentemente, la propia naturaleza dinámica del proceso puede poner en precario el plan anterior.

El Municipio alega en su petición de *certiorari* que eso es, precisamente, lo sucedido en este caso y que tiene la obligación de aplicar el Derecho de planificación como está concebido actualmente, o sea, hasta donde ha progresado el proceso dinámico de revisión de su política pública de ordenación territorial. Por tanto, alega que

---

[83] A su vez, el proceso de decisión y ejecución está enmarcado en un proceso complejo de diseño de política pública. Sobre el mismo, Kruschke y Jackson nos remiten al siguiente modelo estándar: "In general, the policy process involves: (1) Perceiving and defining a problem; (2) placing the problem on the government agenda; (3) aggregating interests involved in the problem; (4) maintaining contacts with those involved; (5) formulating alternative solutions; (6) legitimizing a policy; (7) providing the necessary budget for implementing the policy; (8) implementing the policy; (9) evaluating the policy; and (10) deciding either to revise or to terminate the policy in view of its impact on relevant clientele". E. Kruschke & B. Jackson, The Public Policy Dictionary, Ed. Abc-Clio, Oxford, 1987, pág. 29. Véase, además, M. Hill, The Public Policy Process, 5th Ed., Pearson Longman, Londres, 2009, pág. 142.

tiene la facultad de considerar y aplicar las propuestas de revisión al Plan de Ordenación Territorial, porque éstas constituyen las medidas que el Municipio entiende necesarias para la planificación óptima del entorno local.[84] Para fundamentar esta aseveración, el Municipio nos remite al caso de Hernández, Álvarez v. Centro Unido.[85]

Ahora bien, el Municipio hace caso omiso del contexto fáctico en el cual este Tribunal actuó en el caso citado. Contrario al caso de autos, en Hernández, Álvarez no existía un Plan de Ordenación Territorial municipal y a la luz de este vacío jurídico se debía analizar el proyecto propuesto conforme a la política pública enunciada en los Objetivos y Políticas Públicas del Plan de Usos de Terreno de Puerto Rico. En aquella ocasión, expresamos que:

> …**al no existir ni un plan de usos de terrenos ni un plan de ordenación territorial vigentes** para el área específica en que estaría ubicado el proyecto, **la Junta de Planificación no podía soslayar un documento que sí estaba en vigor, que fue adoptado por ella misma en 1995, y que fue aprobado por el entonces Gobernador de Puerto Rico,** para que fuera un 'documento rector de política pública' que aplicara a los usos de terrenos en todo Puerto Rico.[86]

A diferencia del caso antes citado, aquí estaba vigente un Plan de Ordenación Territorial que regía sobre

---

[84] Petición de *certiorari*, supra, pág. 12.

[85] Hernández, Álvarez v. Centro Unido, supra.
[86] (Énfasis nuestro). *Íd.*, a las págs. 628-629.

la demarcación territorial del Municipio. En lo que sí son similares el caso de autos y el de Hernández, Álvarez es en la pertinencia de la norma, muchas veces repetida por este Tribunal, que una agencia administrativa no puede ejercer sus facultades a espaldas de un documento de política pública debidamente promulgado por la agencia y aprobado por el Gobernador.[87]

En el caso de autos, el Municipio no podía ignorar su propio Plan de Ordenación Territorial para aplicar los enunciados de una revisión de su política pública, cuya puesta en vigor, incluso, no ha sido demostrada.[88] Máxime, cuando la Ley de Municipios Autónomos recoge de forma expresa que "…**[u]na vez el Plan [de Ordenación] Territorial entre en vigor, toda decisión sobre el uso del suelo se hará en conformidad con el mismo**".[89]   Dicho estatuto

---

[87] Además, según hemos establecido, **"una vez la agencia adopta una norma administrativa**, debe cumplirla y aplicarla en la manera en que está concebida, sirviendo siempre a los propósitos, objetivos y política pública que la forjaron". Centro Unido de Detallistas v. Junta, 172 D.P.R. 601, 614 (2007), Torres v. Junta de Ingenieros, 161 D.P.R. 696 (2004), T-JAC, Inc. v. Caguas Centrum Ltd., supra, a la pág. 81.   Montoto v. Lorie, supra, a la pág. 47, García Cabán v. U.P.R., 120 D.P.R. 167, 175 (1987).

[88] Debemos resaltar que la alegación del Municipio ignora nuevamente su propio Reglamento de Calificación de Suelos. Citamos, de forma demostrativa, la Sección 94.03 del Reglamento de Calificación (Reglamento Núm. 4), el cual expone que el uso e intensidad propuesta para un proyecto de desarrollo extenso debe estar conforme con "…**el Plan de Usos de Terrenos hasta donde éste haya sido adoptado y el Plan de Ordenación Territorial**". (Énfasis nuestro).

establece claramente que en nuestra jurisdicción no basta siquiera con que un municipio autónomo adopte un Plan de Ordenación Territorial, ya que su posterior aprobación y puesta en vigor depende del aval de la Junta y el Gobernador de Puerto Rico. Es decir, la adopción de un Plan de Ordenación Territorial por parte del Municipio es tan sólo uno de varios pasos en camino a su vigencia.[90] Por tanto, y ante la falta de prueba en el expediente que nos señale que el Plan de Ordenación Territorial en vigor desde 1999 fue sustituido por otro al momento de atender la autorización de anteproyecto, no podemos refrendar las actuaciones del Municipio.

### C. La aplicación temporal de un Plan de Ordenación Territorial

---

[89] Artículo 13.005 de la Ley de Municipios Autónomos, supra. 21 L.P.R.A. sec. 4603.

[90] El Artículo 13.008 de la Ley de Municipios Autónomos, supra, dispone que "**[p]ara entrar en vigencia**, los Planes de Ordenación requerirán su **aprobación por la Legislatura Municipal, su adopción por la Junta de Planificación y su aprobación por el Gobernador**". (Énfasis nuestro). 21 L.P.R.A. sec. 4606. Véase, además, la Sección 16.03 del Reglamento sobre los Planes de Ordenación Municipal y la Transferencia y Administración de Facultades 5087, (Reglamento de Planificación Núm. 24) de 20 de mayo de 1994. Con ello, esta disposición reconoce que la etapa de la adopción, en el transcurso de la elaboración de una política pública, no constituye el fin del proceso ("[Policy adoption is] [a]n **early stage of the public policy process in which policy decision-makers review and settle on one or a set of alternatives to solve a problem…**"). (Énfasis nuestro). E. Kruschke & B. Jackson, supra, a la pág. 59.

En cuanto al último señalamiento de error, nada en la sentencia del Tribunal de Apelaciones indica que se hayan reconocido derechos adquiridos a Unlimited mediante la aprobación de la consulta de ubicación. El caso de autos versa sobre las prerrogativas delegadas al Municipio y la revisión y aplicación de su Plan de Ordenación Territorial municipal. No obstante, son pertinentes nuestras expresiones en el caso <u>Maldonado v. Junta</u>,[91] donde resolvimos que un reglamento aprobado luego de haberse presentado una consulta de ubicación puede ser fundamento suficiente para denegar la consulta si, al momento de su presentación, el proceso de aprobación de la reglamentación ya había comenzado oficialmente y se habían hecho gestiones tendentes a informar al pueblo sobre el particular.[92] Sin embargo, fuimos claros en cuanto a que la doctrina adoptada en este caso no aplica **cuando la consulta de ubicación haya sido concedida antes de entrar en vigor la nueva reglamentación**.[93]

El Municipio debe atender, nuevamente, la autorización de anteproyecto de Unlimited en la etapa preliminar del proceso operacional, cuyo fin último es determinar si éste cumple con las leyes y reglamentos aplicables.[94]

---

[91] 171 D.P.R. 46 (2007).

[92] *Íd.*, a la pág. 66.

[93] (Énfasis nuestro). *Íd.*, a las págs. 66-67.

Reconocemos que a la fecha en que se emite este dictamen está en vigor un nuevo Plan de Ordenación Territorial. A ese efecto, tomamos conocimiento judicial de la revisión integral aprobada por el primer Ejecutivo el 2 de mayo de 2010.[95] Sin embargo, la alegada incongruencia entre lo dispuesto en este nuevo instrumento de planificación y el Plan de Ordenación Territorial en vigor cuando se presentó la autorización de anteproyecto no es óbice para que el Municipio cumpla con su deber ministerial original de evaluar la solicitud de Unlimited conforme al Plan entonces vigente.

Los tratadistas y la jurisprudencia norteamericana sobre el Derecho de planificación son ilustrativos en cuanto a esto. Según el tratadista Yokley, existe la regla general que dispone que una reglamentación recién en vigor podrá ser aplicada para denegar un permiso de construcción si éste fue presentado pero no concedido antes de su puesta

---

[94] Glosario de Términos de los Reglamentos de Planificación, supra, A-77, pág. 12. A su vez, el Reglamento de Ordenación Núm. 4 del Municipio nos ilustra en torno a la frase "reglamentos aplicables". Éste reglamento define dicha expresión como "[t]odos aquellos reglamentos promulgados y adoptados o aprobados por los distintos organismos gubernamentales incluyendo los del Municipio, publicados de acuerdo con la ley y que sean aplicables al caso específico". Sección 1.10 del Reglamento de Ordenación Núm. 4, supra, pág. 5. Véase, además, Glosario de Términos de los Reglamentos de Planificación, supra, R-22, pág. 110.

[95] Véase, Boletín Administrativo Núm. OE-2010-16, de 2 de mayo de 2010.

en vigencia.[96]    Esto es congruente con nuestra decisión en

Maldonado v. Junta.    Por otro lado, Yokley señala que, como

excepción, esta regla general no aplicará cuando el ente

local con facultad de otorgar permisos de construcción

interpone obstáculos indebidos en el procedimiento.[97]    Los

obstáculos de este tipo reconocidos por la jurisprudencia

norteamericana varían según la jurisdicción pero hay

acuerdo en que el ente municipal encargado de otorgar un

permiso no puede actuar de forma tal que manipule el

sistema que administra, mediante dilaciones innecesarias y

perjudiciales, a la espera de que se apruebe una nueva

reglamentación que sirva de base para no conceder el

permiso.[98]

---

[96] "As a general rule, a newly enacted zoning ordinance will apply retroactively to block a building permit applied but not granted before the effective date of the new ordinance". E.C. Yokley, Zoning Law and Practice, supra, págs. 14-29.

[97] "**If a local government is guilty of misconduct or bad faith in dealing with a permit applicant**, or adopts a rezoning specifically to thwart an applicant's proposed use of land, thereby discriminating against the applicant, **the general rule of retroactive application does not apply**". (Énfasis nuestro). Íd., págs. 14-32.

[98] Véase, Figgie International, Inc. v. Town of Huntington, 203 A.D. 2d 416 (1994), Hatcher v. Planning Bd., 111 A.D.2d 812 (1985), Pokoik v. Silsdorf, 40 N.Y. 2d 769 (1976), Golisano v. Town Bd. Of Macedon, 31 A.2d 85 (1968), Commercial Properties, Inc. v. Peternel, 418 Pa. 304, 211 A.2d 514 (1965).

En Downey Farms Dev. Corp. v. Town of Cornwall Planning Bd., 858 N.Y.S. 2d 542 (2008), la parte proponente presentó una solicitud de segregación ("subdivisión") mientras el municipio estudiaba la revisión de su Plan de

Ahora bien, debemos resaltar que el Municipio fue receptivo y diligente en cuanto a los dos endosos emitidos a favor tanto de la consulta de ubicación original como de la enmienda a la consulta de ubicación, la cual cambió el diseño y la calificación del solar donde se ubicaría el desarrollo propuesto. El tiempo transcurrido entre dichos endosos y la aprobación de la Junta fue mínimo, al igual que la posterior presentación de la solicitud de autorización de anteproyecto ante el Municipio. Sin

_____

Ordenación Territorial ("Comprehensive Plan"), el cual recomendaba un aumento en el tamaño mínimo de ocupación de área del distrito a desarrollarse. Inexplicablemente, el municipio requirió varios estudios innecesarios y se demoró excesivamente, por más de medio año, en referir el asunto a otros entes gubernamentales para su estudio. Al final, no se pudo superar la fase preliminar, a pesar de varias diligencias e iniciativas por parte de la proponente, y la nueva reglamentación entró en vigor, impidiendo así que se completara el proceso de evaluación bajo la reglamentación anterior. El Tribunal Supremo de Nueva York resolvió que cuando la demora indebida en el proceso perjudica a la parte proponente es menester determinar si en las circunstancias más favorables ("best case scenario") la parte proponente hubiese podido obtener la autorización antes de que entrara en vigor la nueva reglamentación. Luego, hace falta precisar si hubo actos innecesariamente dilatorios o negligentes constituyentes de mala fe por parte del ente municipal y si éstos fueron, en efecto, el nexo causal o la razón por la cual la parte proponente no tuvo una oportunidad justa para obtener la autorización antes de entrar en vigor la nueva reglamentación.

Vale resaltar que en Pokoik v. Silsdorf, supra, también medió una orden de mandamus por parte del foro judicial para obligar al ente local a resolver la solicitud presentada por la parte proponente. "This administrative procrastination, calculated to deny a property owner his right to use this land in a currently lawful manner, is supportable neither by law nor by sound and ethical practice" Íd., supra, a la pág. 772, citando 1 Anderson, NY Zoning Law & Practice, § 6.17, pág. 196.

embargo, el expediente ilustra que durante ese proceso operacional posterior a la consulta de ubicación el Municipio actuó de forma diametralmente opuesta, al demorarse de forma irrazonable y sin justificación alguna, en la adjudicación de este asunto.[99]

Recalcamos que la demora de un año y medio en atender este asunto no fue mayor debido a la orden de *mandamus* emitida por el Tribunal de Primera Instancia.[100] Dicho

---

[99] El Convenio de Transferencia de Competencias sobre la Ordenación Territorial del Municipio Autónomo de Guaynabo de 14 de junio de 2005 incluye en su Parte IV que "**[e]n el proceso de evaluación y toma de decisiones sobre las facultades transferidas, el Municipio aplicará y velará por el cumplimiento de sus propios reglamentos…**" (Énfasis nuestro). Convenio de Transferencia de Competencias, supra, a la pág. 23. A su vez, la Sección 4.24 del Reglamento de Ordenación Núm. 4, el cual fue aprobado por el propio Municipio, dispone que **una solicitud de anteproyecto, cuya área de construcción exceda los 50,000 pies cuadrados, se tramitará y se resolverá en un plazo no mayor de 90 días**. Sección 4.24(1)(a) del Reglamento para Regir las Disposiciones Sustantivas, Procesales y de Procedimientos Adjudicativos de la Oficina de Permisos del Municipio Autónomo de Guaynabo, supra, a la pág. 33. Resaltamos que aunque los términos provistos en este reglamento son términos directivos, no es menos cierto que hay una gran diferencia entre 90 días y un año y medio, máxime con las diligencias realizadas por Unlimited para que se atendiera su solicitud con prontitud.

[100] El Municipio pudo haber decretado una moratoria en la consideración de permisos mientras llevaba a cabo la revisión de la política pública en torno a sus suelos, facultad que puede ejercer, por disposición estatutaria y reglamentaria, cuando lo estime necesario. Concretamente, la moratoria cumple con el propósito de facilitar la elaboración o revisión de un Plan de Ordenación mediante la suspensión total o parcial de la concesión de nuevas autorizaciones y permisos por la Junta o el Municipio. Sección 17.00 del Reglamento sobre los Planes de Ordenación Municipal y la Transferencia y Administración de Facultades (Reglamento de Planificación Núm. 24), supra, a la pág. 17-

atraso es significativo, pues, como hemos explicado antes, la fase de anteproyecto "…**sirve para acelerar el trámite de expedición de los permisos de construcción correspondientes**"; es decir, "**[s]e trata propiamente de un permiso con el que se inicia un proceso que conduce expeditamente a los permisos definitivos de construcción**".[101] Llama la atención el que hayan transcurrido tres años entre la denegación de la autorización de anteproyecto y la puesta en vigencia del nuevo Plan de Ordenación Territorial, cuya adopción, alegadamente, fue la razón para la denegación. Lo anterior, junto a la ausencia de un escrutinio sobrio de la

---

1. A su vez, la Sección 17.01 dispone que "[l]os municipios sólo podrán decretar la moratoria para aquellas autorizaciones o permisos comprendidos dentro de las jerarquías de facultades de ordenación territorial que le hayan sido conferidas y para revisar un Plan de Ordenación o un Reglamento de Ordenación". *Íd.* Véase, además, el Artículo 13.009 de la Ley de Municipios Autónomos, (21 L.P.R.A. sec. 4607). Nuestra jurisprudencia demuestra el uso responsable de la moratoria tanto para que no se afectara el proceso de elaboración o revisión de un Plan de Ordenación como para no causarle perjuicios a la parte proponente que solicita una autorización o un permiso. En Borschow Hosp. v. Junta, supra, el Municipio Autónomo de San Juan se sirvió de este mecanismo para suspender la concesión de nuevas autorizaciones o permisos en una zona particular de su demarcación territorial, debido a que se encontraba elaborando su Plan de Ordenación Territorial. Además, en ese caso el municipio autónomo endosó la consulta de ubicación presentada ante la Junta pero condicionada a las disposiciones del futuro Plan de Ordenación Territorial.

[101] (Énfasis nuestro). Mun. de San Juan v. J.C.A., 152 D.P.R. 673, 712 (2000).

Resolución de la Junta en el documento informando la decisión municipal, nos lleva a concluir que el Municipio no atendió de forma diligente la autorización de anteproyecto solicitada.[102]

El Municipio aseveró en sus escritos que procedía denegar la autorización de anteproyecto en razón de la excesiva tardanza de Unlimited en presentar su solicitud,

---

[102] La denegación del ente municipal fue parca y carente de un estudio serio de las determinaciones de la Junta en cuanto a la viabilidad del negocio de mini-almacenes, cuya naturaleza es más propia a un uso comercial que industrial, bajo las disposiciones correspondientes a un Distrito mixto R-3 y C-3. Resaltamos que la Sección 16.02 del Reglamento de Calificación de Suelos del Municipio Autónomo de Guaynabo, Vol. III del Plan de Ordenación Territorial del Municipio Autónomo de Guaynabo de 1999, permite ciertos usos ligados al almacenaje en distritos C-3. El inciso (6) de esta sección permite que un predio calificado como C-3 se destine al "**[a]lmacenaje** y venta de **muebles y artículos domésticos**". (Énfasis nuestro). Sección 16.02(5) del Reglamento de Calificación de los Suelos, supra, pág. 93. Igualmente, la Sección 16.02(19) de este reglamento permite el uso destinado a un "[c]omercio o **almacenaje de películas** y estudios cinematográficos". (Énfasis nuestro). *Íd.* Además, la Sección 16.02(65)(j) permite en este distrito usos industriales siempre y cuando no produzcan condiciones, tales como polvo, humo, fuego, etc., que puedan afectar áreas adyacentes. En particular, este inciso expresa que se permitirá "**[c]ualquier otra actividad industrial a tono con el sector donde ha de ser establecida cuando se demuestre que por medio del diseño o de la instalación propuesta se protege la salud, seguridad, y bienestar general de los posibles ocupantes del edificio y de los residentes de las propiedades limítrofes** y no se menoscabe el suministro de luz y aire a la edificación a ocuparse o a las propiedades vecinas, o se aumente el peligro de fuego, o se ocasione reducción o perjuicio a los valores de las propiedades establecidas en el sector". (Énfasis nuestro). *Íd.*, pág. 96. El proyecto propuesto por Unlimited es de naturaleza comercial pero con diseño industrial, requiere poca mano de obra y no tiene indicios de poner en riesgo la seguridad de los colindantes como lo haría un proyecto netamente industrial.

cuando ello claramente no es cierto.[103] A esto añadimos que nunca presentó evidencia para acreditar el inicio del proceso de revisión de su Plan de Ordenación Territorial, según dispone el Reglamento de Planificación Núm. 24 y el Artículo 13.008 de la Ley de Municipios Autónomos,[104] ni tan siquiera aportó ejemplos concretos de los cambios en la política pública alegadamente en proceso.[105] Asimismo, en el alegato presentado por la Junta no se menciona siquiera que se hubiera iniciado formalmente el proceso de coordinación entre ambos entes gubernamentales.

---

[103] Respecto a su postura, en torno a los efectos del cambio en su política pública, el Municipio señaló que la incongruencia entre su endoso en el proceso de la consulta y la denegación posterior se debió al transcurso de cuatro años entre la aprobación de la enmienda a la consulta de ubicación y la presentación de la autorización de anteproyecto. "Mediante resolución de 1 de mayo de 2007, el anteproyecto fue denegado. **Nótese, unos cuatro (4) años después de la aprobación de la consulta [Unlimited] presenta un anteproyecto en la Oficina de Permisos del Municipio de Guaynabo, acompañado por la resolución de la Junta [de Planificación]**". (Énfasis nuestro). Petición de *certiorari*, pág. 12. Esta misma aseveración incorrecta fue alegada ante el Tribunal de Apelaciones. Véase, Oposición a Revisión Judicial. Apéndice 9, págs. 286-287.

[104] "Todo municipio que **decida revisar integralmente un Plan de Ordenación deberá notificarlo por correo certificado con acuse de recibo a la Junta, antes de comenzar sus trabajos**". (Énfasis nuestro). Sección 16.01 del Reglamento de Planificación Núm. 24, supra, a la pág. 16-1. Véase, además, el Artículo 13.008 de la Ley de Municipios Autónomos, supra. 21 L.P.R.A. sec. 4606.

[105] El Municipio ni siquiera presentó un Avance del Plan, el cual "resume e ilustra las decisiones o **recomendaciones preliminares más importantes de un Plan de Ordenación en desarrollo**". (Énfasis nuestro). Sección 2.00(2) del Reglamento de Planificación Núm. 24, supra, a la pág. 2-1.

La conducta ministerial del Municipio evidenciada en el expediente, sin duda, impidió que Unlimited obtuviese el permiso de construcción antes de que entrara en vigor el Plan de Ordenación Territorial de 2010. Siendo ello así, no podemos avalar la denegación del permiso ni que una vez devuelto el expediente, el Municipio atienda la autorización de anteproyecto del caso de autos bajo las disposiciones del nuevo Plan de Ordenación Territorial.

Recordemos que, mediante la Ley de Municipios Autónomos, la Asamblea Legislativa redefinió la política pública administrativa para dar paso a una transformación gubernamental que reestructuró las funciones del municipio tradicional.[106] El resultado fue redimensionar la gestión municipal como vínculo fundamental entre la ciudadanía y el

---

[106] Sobre los inicios de la relación ministerial entre la Junta y los municipios, en la planificación de sus suelos, el entonces Presidente de la Junta de Planificación, el doctor Rafael Picó, ilustra que "[l]a **Junta está facultada por ley para crear y nombrar, para cualquier municipio, a petición del alcalde, una Comisión Local de Planificación. Esta Comisión podrá asesorar a la Junta, cuando sea consultada por ésta, o a iniciativa propia, respecto a cualesquiera problemas de planificación local en su municipio, principalmente en lo que concierne a obras públicas y a la zonificación.** Al lograr estos objetivos, consideraremos entonces que la planificación ha penetrado en el corazón de Puerto Rico y sus habitantes". (Énfasis nuestro). R. Picó, 10 años de Planificación en Puerto Rico, Junta de Planificación, San Juan, 1952, a la pág. 15. Véase, además, Memorial Explicativo del Reglamento sobre los Planes de Ordenación Municipal y Transferencia y Administración de Facultades, (Reglamento de Planificación Núm. 24), supra, a la pág. 1.

Gobierno Central.[107]  Al igual que la reforma de 1975, la cual vio nacer a A.R.P.E. como brazo operacional de la Junta, la reforma municipal tiene como axioma asegurar la más estrecha coordinación entre los diversos entes administrativos a la hora de ejercer los poderes compartidos de planificación sobre los suelos de Puerto Rico.[108] Esta unión entre el ente central y el municipal requiere, forzosamente, la armonización de esfuerzos, para que sean complementarios y compatibles y no constituyan estorbos mutuos en el desarrollo del uso óptimo de los suelos a nivel municipal, que es el fin primordial de la planificación bajo esta reforma administrativa.[109] De esta

---

[107] "**Los poderes y facultades conferidos a los municipios… se interpretarán liberalmente, en armonía con la buena práctica de política pública** fiscal y **administrativa,** de forma tal que siempre se propicie el desarrollo e implantación de la política pública enunciada… **de garantizar a los municipios las facultades necesarias en el orden jurídico, fiscal y administrativo para atender eficazmente las necesidades y el bienestar de sus habitantes**". (Énfasis nuestro). CIA Turismo de P.R. v. Mun. de Vieques, 179 D.P.R. 578, 584-585 (2010), citando 21 L.P.R.A. sec. 4002.

[108] Mun. de San Juan v. Plaza Las Américas, 169 D.P.R. 310, 321 (2006), Metropolitan S.E. v. A.R.P.E., 138 D.P.R. 200, 207 (1995).  Debemos resaltar que en el ejercicio de éstas y otras facultades delegadas, A.R.P.E. debe actuar conforme a la autorización y condiciones consignadas mediante resolución de la Junta, en sus reglamentos o la propia Ley Núm. 75. Véase, el Artículo 5 de la Ley Orgánica de A.R.P.E., supra. 23 L.P.R.A. sec. 71d y 23 L.P.R.A. secs. 62 a 63j.

[109] El Convenio de Transferencia, firmado por tanto la Junta como el Municipio, establece los principios de coordinación y fiscalización que procura "**[a] los fines de lograr una**

forma, se reafirma que la aspiración municipal de autonomía no es irrestricta ni puede funcionar dentro de un marco de actuación irrazonable o caprichosa.[110]

Resulta evidente que el Municipio queda facultado y limitado según determine la Asamblea Legislativa.[111] En el caso de autos el proceder del Municipio incide directamente

coordinación efectiva la Junta de Planificación, la [A.R.P.E.] y el Municipio deberán, en sus relaciones recíprocas… [r]espetar el ejercicio legítimo… de las funciones y responsabilidades de su competencia o jurisdicción y las consecuencias que de éstas se deriven". (Énfasis nuestro). Convenio de Transferencia de Competencias, supra, Parte V (A)(1), pág. 26.

[110] La norma general es que las decisiones de los organismos administrativos deben ser consideradas con gran deferencia por los tribunales apelativos, por razón de la experiencia y pericia de las agencias respecto a las facultades que se les han delegado. Estas decisiones administrativas deben ser respetadas a menos que la parte recurrente establezca que hay evidencia en el expediente administrativo suficiente para demostrar que la agencia no actuó razonablemente. Véase, Mun. de San Juan v. C.R.I.M., 178 D.P.R. 163, 175 (2010), Borschow Hosp. v. Junta, 177 D.P.R. 545 (2009), Hatillo Cash & Carry v. A.R.P.E., 173 D.P.R. 934 (2008); Otero v. Toyota, 163 D.P.R. 716 (2005); Rivera Concepción v. A.R.P.E., 152 D.P.R. 116 (2000), Misión Ind. P.R. v. Junta, 142 D.P.R. 64, 131-132 (1998). Conforme a esta línea argumentativa, el profesor Fernández Quiñones expresa que "[s]ólo cuando las agencias administrativas estén diseñando cuestiones de hecho o de política pública altamente técnica es que se determina que las agencias se encuentran mejor equipadas para hacer la decisión que interpreta la ley. Empero, […] el hecho de la especialización o el manejo de cuestiones técnicas no es una carta en blanco para que se actúe en forma caprichosa, arbitraria e irrazonable". (Énfasis nuestro). Asoc. Fcias. v. Caribe Specialty et al. II, 179 D.P.R. 923 (2010), citando a D. Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, supra, a la pág. 560.

[111] Pfizer Pharms. v. Mun. de Vega Baja, 2011 T.S.P.R. 93, 182 D.P.R. ___ (2011).

en el Artículo 13.012 de la Ley de Municipios Autónomos, el cual dispone que "[n]ingún municipio que tenga facultad para evaluar y expedir permisos para el tipo de obra o proyecto cuya facultad de consideración se retiene por las agencias públicas podrá negarse a aprobar la obra o proyecto, de estar dicha obra o proyecto en conformidad con lo dispuesto por las agencias administrativas, ni podrá modificar las condiciones impuestas por éstas".[112] Por tanto, refrendar los actos del Municipio constituiría, como bien declaró el foro apelativo, revalidar un ataque colateral con visos de revocar *de facto* una consulta de ubicación debidamente aprobada, la cual advino final y firme.[113]

En resumen, concluimos que la competencia delegada a un municipio autónomo para recalificar directamente su suelo municipal no es impedimento para que la Junta ejerza la facultad retenida de aprobar una consulta de ubicación que constituya, a su vez, una recalificación indirecta.[114] Igualmente, un municipio autónomo no puede guiar sus

---

[112] Artículo 13.012 de la Ley Núm. 81, supra. 21 L.P.R.A. sec. 4610. Véase, además, el Convenio de Transferencia de Competencias, supra, a la pág. 33 y la Sección 18.02 del Reglamento de Planificación Núm. 24, supra, a las págs. 18-9 y 18-10.

[113] Sentencia del Tribunal de Apelaciones de 30 de agosto de 2007, pág. 12.

[114] Facultad que se retiene mientras no se delegue expresamente a un municipio autónomo, mediante la Jerarquía V, la facultad de aprobar una consulta de ubicación que constituya una recalificación indirecta.

determinaciones cuasi-adjudicativas a base de un documento integral de planificación, como lo es el Plan de Ordenación Territorial, que no esté en vigor, conforme al procedimiento prescrito en el Artículo 13.008 de la Ley de Municipios Autónomos. Tampoco tiene autoridad para revocar *de facto* las facultades debidamente ejercidas por la Junta.

Por todo lo antes expuesto, se confirma la sentencia del Tribunal de Apelaciones y se devuelve el caso a la Oficina de Permisos del Municipio Autónomo de Guaynabo para que se continúen los procedimientos y se determine si el proyecto propuesto cumple con la normativa aplicable conforme la reglamentación y la política pública en vigor al momento de presentarse la autorización de anteproyecto.

Se dictará sentencia de conformidad.


Liana Fiol Matta
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Unlimited Storage Corporation
          Recurrida

            v.                                    *Certiorari*
                              CC-2007-1035

Municipio    Autónomo    de
Guaynabo Oficina de Permisos
Urbanísticos
          Peticionarios

*SENTENCIA*

En San Juan, Puerto Rico, a 15 de diciembre de 2011.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se confirma la sentencia del Tribunal de Apelaciones y se devuelve el caso a la Oficina de Permisos del Municipio Autónomo de Guaynabo para que se continúen los procedimientos y se determine si el proyecto propuesto cumple con la normativa aplicable conforme la reglamentación y la política pública en vigor al momento de presentarse la autorización del anteproyecto.

Lo acordó y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. Los Jueces Asociados señor Rivera García y señor Feliberti Cintrón concurren sin opinión escrita. La Jueza Asociada señora Pabón Charneco no interviene. El Juez Presidente señor Hernández Denton y el Juez Asociado señor Martínez Torres están inhibidos.

Larissa Ortiz Modestti
Secretaria del Tribunal Supremo, Interina